LIBERTY LOBBY, INC., et
al., Plaintiffs,

v.

Jack ANDERSON, et al., Defendants.

Civ. A. No. 81–2240.

United States District Court,
District of Columbia.

March 30, 1983.
On Motion for Summary Judgment
March 31, 1983.

See also, D.C., 96 F.R.D. 10.

Fleming Lee, Washington, D.C., for plaintiffs.

David J. Branson, Leonard Appel, Washington, D.C., for defendants.

## MEMORANDUM ORDER

BARRINGTON D. PARKER, District Judge.

In support of the motion for summary judgment the defendants have filed and rely primarily on an affidavit of Charles Bermant. They also rely on an affidavit of Winfield Scott Stanley. Bermant authored the articles which are the subject of the libel action.

Liberty Lobby and Willis Carto have moved to strike paragraphs 20, 21, and 22 of Bermant's affidavit and the entire appendices, contending the requirements of Rule 56(e) Fed.R.Civ.P. have not been met. They challenge the entire Stanley affidavit and move to strike it.

For the reasons set out below the motion is denied.

### The Bermant Affidavit

■ The objection to paragraph 20 is that Bermant states in part that he *believes* that the articles written were truthful and accurate and that the sources were reliable and truthful. Plaintiffs challenge the affidavit asserting that it does not comply with the requirements of Rule 56(e), Fed.R.Civ.P., and that it is inadmissible, citing *Jameson v. Jameson,* 176 F.2d 58 (D.C.Cir. 1949).* While an affiant's opinion or belief is normally inadmissible, in a libel case statements concerning a defendant's state of mind and belief are admissible because they go to the core of the inquiry. A defendant's state of mind is central to the question of whether he published with actual malice. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). The existence of a particular belief or opinion will often determine whether a defendant is liable. Thus, in *Herbert v. Lando,* a libel action, the plaintiff was permitted to inquire into the state of mind and editorial processes of the defendants. "[C]onclusions as to the importance and veracity of sources and information presented in the article" were properly included in the record when the existence of malice was controverted. *Id.* at 160 n. 6, 99 S.Ct. at 1641 n. 6. Bermant's opinions and beliefs as to the veracity of his material were not improper and should not be stricken.

* The defendants suggest and the Court agrees

■ Paragraph 21 recites that Bermant had prepared an appendix to his affidavit detailing the sources relied upon when making the statements that plaintiffs have now challenged. Bermant stated his belief that the sources, including members of Congress, several local Washington newspapers, and the Los Angeles Times, were reliable. The plaintiffs assert that these are Bermant's conclusions and opinions, not based on personal knowledge, and are therefore inadmissible. Plaintiffs' challenge is misplaced. The questioned statements were indeed based upon Bermant's personal knowledge, and he specifically refers to the sources upon which he relied in preparing the publications. He also stated his belief that those sources were dependable and reliable. The type of challenge and objection raised by the plaintiffs in this instance was fully discussed and rejected in *Herbert v. Lando,* 441 U.S. at 165–166 n. 15, 99 S.Ct. at 1643 n. 15.

■ For the same reasons plaintiffs' motion to strike paragraph 22 must also be denied. Ironically, the objectionable source in this instance is *Imperium,* a book authored by F.P. Yockey, the introduction to which was written by the plaintiff Willis Carto and published by Liberty Lobby. This, of course, gives added support to the reasonableness of Bermant's belief in the accuracy and reliability of his sources.

The appendices contain quotations from various sources utilized by Bermant in his articles. They are challenged because they constitute inadmissible hearsay, are not exhibited or quoted in full, but rather are "excerpts taken entirely out of context," and are not authenticated or certified copies.

■ The argument that the appendices contain inadmissible hearsay under evidence Rule 802 is not convincing. For an out-of-court statement to be hearsay, it must be offered to prove the truth of the matter asserted. But here, the excerpts are not offered to prove the truth of the allegations they contain. Rather, they are submitted without regard to their truth or falsity, only to show Bermant's state of mind and that in relying upon them he lacked malice.

that *Jameson* is inapposite.

■ Nor is the argument that defendants have failed to establish a proper foundation and that the appendix materials are not authenticated persuasive. Bermant's affidavit, particularly ¶ 21, establishes the foundation for the statements contained in the appendix and identifies these materials as his sources for the allegedly defamatory statements. In a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence. *First National Bank Co. v. Insurance Co. of North America,* 606 F.2d 760, 766 (7th Cir.1979); *Schy v. Susquehanna Corp.,* 419 F.2d 1112, 1116 (7th Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Further, many of the sources, such as newspapers and periodicals, are self-authenticating under evidence Rule 902(6). Others, such as the excerpts from the declarations made by William Cox, are supported by deposition. While in some situations courts have required that the documents be submitted in full, *see, e.g., Walling v. Fairmont Creamery Co.,* 139 F.2d 318 (8th Cir.1943), the defendants will not be required to submit all sources in their entirety—many of which are obviously of great length. Moreover, all sources were made available to plaintiffs during the course of discovery, and they have had the opportunity to correct any misleading impressions that might have been created by statements incorrectly quoted or taken out of context.

### The Stanley Affidavit

Winfield Scott Stanley, Jr., the editor of two John Birch Society publications, *The Review of News* and *American Opinion,* was quoted by Bermant in the articles as being of the opinion that Carto is anti-Semitic. When Liberty Lobby and Carto, in their opposition, challenged the validity of that quotation, defendants submitted with their reply brief the Stanley affidavit. Stanley stated that indeed it was his view that Carto was anti-Semitic and, in addition, racist. Plaintiffs moved to strike the Stanley affidavit, arguing that it was an inadmissible opinion, and, further, that it contradicted Stanley's deposition, where Stanley denied ever making the quoted statements.

■ Bermant relied upon Stanley's opinions in writing the articles. Consequently, Stanley's opinions can shed light on Bermant's state of mind and on the existence of malice. Anything which can contribute to an understanding of Bermant's state of mind is admissible under *Herbert v. Lando.* Especially here, where Liberty Lobby and Carto interjected the issue of Stanley's opinions in their opposition to the motion for summary judgment, they will not be permitted to bar the introduction of the Stanley affidavit by way of rebuttal. Any contradiction between Stanley's affidavit and his deposition goes only to the weight to be accorded to it, not its admissibility. *See* 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2738 at 686 (1973).

## ON MOTION FOR SUMMARY JUDGMENT

In this action the defendants, who are engaged in the publishing business, were responsible for publishing statements that the plaintiffs were neo-Nazi, fascist, anti-Semitic, and racist. The plaintiffs' complaint alleges that the statements were false and derogatory, and they seek general and punitive damages. The defendants have moved for summary judgment on the grounds that the plaintiffs are public figures, that there is no evidence of actual malice, and that the plaintiffs are libel-proof.

The parties' memoranda of law, the several affidavits, and the entire record have been considered. The Court determines as a matter of law that the defendants are entitled to summary judgment and that the libel complaint should be dismissed. The reasons for this conclusion are set out in the discussion which follows.

A second count of the complaint charges that in 1966 the defendant Jack Anderson took possession and control of and converted to his use certain property—files—of the plaintiffs. This count is also subject to a

motion for summary judgment. The motion is likewise granted.[1]

## BACKGROUND

While it is claimed that there are numerous disputed facts in this libel suit, many are of limited, if any, consequence. The material underlying facts necessary for disposition of this motion for summary judgment are uncontested and set out below.

Liberty Lobby is a not-for-profit corporation headquartered in the District of Columbia. Plaintiff Willis A. Carto is its founder, treasurer and its chief lobbyist. Liberty Lobby "is the first citizens' lobby in the United States," with an avowed purpose to advocate and promote "patriotism, nationalism, lawfulness, protection of the national interests of the United States and the economic interests of its citizens, and strict adherence to the United States Constitution and the form of government it establishes."[2] To disseminate its views, Liberty Lobby publishes a weekly national newspaper, *The Spotlight,* with more than 335,000 paid subscribers and an even greater number of readers. A daily radio commentary, "This is Liberty Lobby," is carried over 460 stations, and a weekly half-hour television news show is broadcast on 30 stations.

The two articles giving rise to this libel suit were published in the October 1981 issue of *The Investigator,* a magazine published by defendant Investigator Publishing Company. Defendant Jack Anderson was publisher of the magazine; defendant Bill E. Adkins was the president and chief executive officer of the Investigator Publishing Company. *The Investigator* has since ceased publication.

The two articles, entitled "The Private World of Willis Carto" and "Yockey: Profile of an American Hitler," were authored by Charles Bermant, an employee of the defendants, and edited by Jack Anderson. The articles were introduced by a section signed by "The Editors": "Did *Mein Kampf* Spawn Yockey's *Imperium,* a Book Revived by Carto's Liberty Lobby?" The publica-

tions recount the history of Carto and Liberty Lobby, and convey statements expressed by many organizations and individuals describing Carto and Liberty Lobby's views. Without doubt, the plaintiffs are referred to as neo-Nazi, fascist, anti-Semitic and racist. The portrayals form the basis for plaintiffs' libel complaint.

To support their motion for summary judgment, the defendants submitted the affidavit of Charles Bermant.[3] His affidavit details the investigative means he utilized in his research before writing the articles. He rebuts, point by point, each of the plaintiffs' allegations of libel, and reveals the sources he relied upon in composing each of the allegedly libelous statements. In preparing for the articles, Bermant secured more than 1000 pages of documents from the federal government under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* He collected newspaper articles and press clippings published by *The Washington Post, The Washington Star, The Los Angeles Times,* William Buckley's *National Review, True Magazine,* and the Anti-Defamation League of B'nai B'rith. Statements by congressmen reported in the *Congressional Record* were also relied upon. Several examples from the sources uncovered by Bermant are illustrative:

> An outspoken anti-Semite who has professed an abiding admiration for Hitler and Nazi Germany and has been the moving force behind a network of Jew-hating organizations and publications over the years is also the unpublicized force behind "This is Liberty Lobby," an extremist radio program carried five times a week by some 126 stations around the country.
>
> His name is Willis A. Carto....
>
> Years ago, Carto wrote to a fellow rightist, Norris Holt: "Hitler's defeat was the defeat of Europe. And America.... The blame must be laid at the door of the international Jews."

120 Cong.Rec. E4841 (daily ed., July 18, 1974) (remarks of Rep. Eilberg).[4]

---

1. The motion is discussed, *infra,* p. 210.

2. Complaint at ¶ 12.

3. Affidavit of Charles Bermant, filed August 19, 1982.

4. *Id.,* appendix at 31.

"Carto wants a nationalist socialist dictatorship" in the United States, a former Liberty Lobby executive told a reporter. Chandler, " 'Debunkers' of Holocaust Linked to Right-Wing Extremists," *Los Angeles Times,* May 3, 1981.[5]

"The revolutionists have seen to it," Carto wrote the racist author Earnest Sevier Cox in 1955, "that only a few Americans are concerned about the inevitable niggerfication of America." But Carto had a plan, for a "flank attack." He established, and promoted secretly the Joint Council for Repatriation—a send-'em back-to-Africa movement with an added benefit: ". . . such a movement would be the strongest blow against the power of organized Jewry that can be imagined."

Simonds, "The Strange Story of Willis Carto," *National Review,* September 10, 1971, at 979.[6]

Bermant also relied upon information from William Cox, a California attorney, who had represented a client in litigation against the Institute for Historical Review, an organization established by Carto. Cox brought suit in connection with an offer of $50,000 made by the Institute to anyone who could prove whether the death of six million Jews in the Holocaust ever took place.

Bermant even approached Liberty Lobby and interviewed Robert M. Bartell, Chairman of Liberty Lobby's Board of Policy. He tried repeatedly to obtain an interview with Carto. Such efforts were not successful.

Another source relied upon was the book *Imperium,* written by Francis Parker Yockey and currently advertised and sold by Liberty Lobby. In 1960, Yockey was imprisoned on charges of passport fraud and assaulting a police officer. While in jail he committed suicide, but not before Carto succeeded in meeting with him. Impressed by that jailhouse encounter, Carto later wrote in a 35-page introduction to Yockey's *Imperium:* "I knew I was in the presence of a great force, and could feel History standing beside me."[7] As understated in the complaint, Carto "has never made secret his admiration for Yockey."[8] That admiration was for a man who, in his book *Imperium,* wrote:

> The Jew is a product of another Culture . . . . This basic fact kept the Jew entirely separate from the West spiritually and racially—the West rejected his world-feeling, he rejected its. Mutual hatred and mutual persecution only strengthened the Jewish race, sharpened its cunning and increased its resentment.[9] Thus, the Negro in general rejects the white race, and the white race rejects the Negro. The culture barrier is also present, for the Negro is below our culture even though he has lived within its area for centuries.[10]

Based on these and a number of other sources more fully quoted in Bermant's affidavit, the defendants have moved for summary judgment. They claim that Liberty Lobby and Carto are public figures who must prove, by clear and convincing evidence, actual malice on the part of the defendants. They further assert that summary judgment is appropriate because malice is lacking as a matter of law, since Bermant reasonably relied on the fruits of his exhaustive investigation and a host of prior reports regarding Liberty Lobby and Carto.[11]

---

5. *Id.,* appendix at 4, 32.

6. *Id.,* appendix at 14.

7. *Id.,* appendix at 10, quoting from Carto's introduction to *Imperium.*

8. Complaint at ¶ 14(IV).

9. Affidavit of Bermant at ¶ 22, quoting *Imperium* at pp. 311–12.

10. Affidavit of Bermant at ¶ 22, quoting *Imperium* at 313.

11. In addition, defendants maintain that Liberty Lobby and Carto are "libel-proof," since the challenged portions of the articles could not harm the reputations of Liberty Lobby and Carto in any way beyond the harm already caused by the remaining, unchallenged portions of the articles. *See* note 12, *infra.*

The plaintiffs disagree, arguing that an issue of fact remains concerning the absence of malice, which of necessity precludes summary judgment. They point to numerous inaccuracies in Bermant's sources, and claim that many of those relied upon by him were patently unreliable. As an example, they point to a magazine article in *True* which Bermant utilized. That article was also the subject of a libel suit, which was settled when *True* agreed to pay a certain sum of money and to publish a subsequent article in *True* written to Liberty Lobby's specifications. Despite that settlement, Bermant relied upon the initial article in *True*. Liberty Lobby and Carto also assert that the defendants failed to verify their sources or take appropriate measures to ascertain the truth of the material in the articles, and that some sources, such as William Cox, were obviously biased. Further, they claim that the defendants avoided publication of non-derogatory statements from other sources when such statements contradicted the negative statements contained in the articles. All of this, in plaintiffs' view, creates issues of fact with regard to the existence of malice, and merits a denial of defendants' motion for summary judgment.

The Bermant affidavit serves as a supporting arch to the defendants' motion for summary judgment. The plaintiffs moved to strike certain parts of the affidavit and all appendices, claiming that the portions objected to failed to satisfy and measure up to the requirements of Rule 56(e), Fed.R. Civ.P. In a Memorandum Order of March 30, 1982, the motion was found to be without merit and was denied.

## ANALYSIS

### The Libel Claim

#### 1. Public Figures

■ Defendants argue that since plaintiffs are "limited-purpose public figures," they must therefore prove actual malice by "clear and convincing proof" in order to prevail. The issue of whether the plaintiffs are public figures presents a question of law to be decided by the Court. *Waldbaum*

*v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that the First and Fourteenth Amendments require a public official to prove the existence of actual malice to prevail in a libel suit. A lesser standard would negate the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *Id.* at 270, 84 S.Ct. at 721. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that principle was extended beyond public officials to embrace public figures, defined in either of two ways:

> [The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974). The second category of public figure, the individual who "voluntarily injects himself ... into a particular public controversy," is often referred to as a "public figure for limited purposes."

> [A] person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants.

*Waldbaum,* 627 F.2d at 1292.

■ Defendants claim that the plaintiffs constitute "limited-purpose public figures,"

208

and therefore bear the heavy burden of proving actual malice. Plaintiffs, in a half-page argument devoid of citations, disagree. The Court agrees with the defendants, and rules that, because Liberty Lobby and Carto are "limited-purpose public figures," the burden is theirs to prove actual malice by "clear and convincing proof." *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008. Both plaintiffs have attempted to affect the resolution of public disputes having widespread ramifications. That conclusion is evident from their confessed purpose of promoting "patriotism, nationalism, lawfulness, protection of the national interests ... and strict adherence to the United States Constitution...." To effectuate those purposes, Liberty Lobby publishes a newspaper, and broadcasts its radio commentary and television news show. As its very name implies, Liberty Lobby is concerned with influencing matters of public interest. "The express purposes and the admitted activities of Liberty Lobby—political lobbying and dissemination of information on highly controversial subjects—render its affairs a matter of public interest." *Liberty Lobby, Inc. v. Pearson,* 390 F.2d 489, 491 (D.C.Cir. 1968) (Burger, J.). As lobbyists, both Carto and Liberty Lobby are "limited-purpose public figures." *See Pauling v. Globe-Democrat Publishing Co.,* 362 F.2d 188, 196 (8th Cir.1966) (Blackmun, J.), *cert. denied,* 388 U.S. 909, 87 S.Ct. 2097, 18 L.Ed.2d 1347 (1967). The fact that Liberty Lobby is a corporation rather than a person does not warrant a different conclusion. *See, e.g., Gospel Spreading Church v. Johnson Publishing Co.,* 454 F.2d 1050, 1051 (D.C.Cir. 1971).

### 2. Actual Malice

■ In proving actual malice, a public figure must show that the allegedly libelous statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26.

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigat-

ed before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (emphasis added).

■ Because malice requires "that the defendant *in fact* entertained serious doubts," failure to check the reliability of a source is not sufficient to indicate the presence of malice, unless there was an obvious reason to doubt the source's veracity. *See id.* at 732, 88 S.Ct. at 1326. In *New York Times v. Sullivan,* no malice was found, despite the fact that there were news stories in the files of the newspaper which, if checked, would have revealed the falsity of the allegedly libelous advertisement. The failure to discover those news stories constituted, at most, negligence, not malice. 376 U.S. at 287–88, 84 S.Ct. at 729–30. "[M]ere proof of failure to investigate without more, cannot establish reckless disregard for the truth." *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003. More specifically,

> [while] verification of the facts remains an important reporting standard, a reporter, without "a high degree of awareness of their probable falsity," may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official.

*New York Times v. Connor,* 365 F.2d 567, 576 (5th Cir.1966).

■ If lack of investigation does not constitute malice, it follows *a fortiori* that a plaintiff cannot succeed in proving malice when the defendant has conducted a thorough investigation, and uncovered a host of articles published in a variety of widely circulated newspapers and periodicals. Even if all the statements contained in those sources prove false or one-sided, a reporter relying upon them in writing a story would not have "in fact entertained

serious doubts as to the truth of his publication." "The subjective awareness of probable falsity required by *St. Amants v. Thompson* [sic] . . . cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied." *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 862 (5th Cir.1978). For that reason, the court in *Rosanova* affirmed the district court's granting of summary judgment.

 Because Bermant thoroughly investigated and researched the articles, the plaintiffs cannot prove the existence of malice, and therefore defendants' motion for summary judgment should be granted. Bermant's reliance upon numerous sources—*The Washington Post, The Washington Star, The Los Angeles Times, National Review, True Magazine,* the *Congressional Record, Imperium,* press releases of the Anti-Defamation League, as well as the several individuals interviewed—negates a finding of malice. The Court, in examining the affidavit of Bermant, finds that as a matter of law the information contained within these sources substantiates each allegation contained in the articles. That some of the assertions in the defendants' articles may be based on one-sided sources or that isolated statements may prove false, does not create a factual issue as to malice, especially in light of defendants' finely etched effort presenting in careful detail the journalistic research underlying each statement.

This conclusion is reinforced by the reality that plaintiffs manage to attack only a small proportion of the sources that defendants relied upon. Thus, even granting the patent unreliability of the article in *True Magazine* (because of the earlier libel suit), or of William Cox (because of his position as attorney representing a client who sued the Institute for Historical Research), or of any of the other contested sources, there still remains sufficient support for the assertions made in defendants' articles to negate a finding of malice. It was not for naught that the District of Columbia Circuit spoke of Liberty Lobby's reprehensible "overtones of anti-Semitism ad [sic] racism." *Liberty Lobby, Inc. v. Pearson,* 390 F.2d at 491 n. 7.[12]

In *Wasserman v. Time, Inc.,* 424 F.2d 920, 922 (D.C.Cir.), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970), Judge Wright of our Circuit Court noted in a concurring opinion:

> *New York Times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard for the truth. . . . Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant. (citations omitted)

**12.** In view of this Opinion, the Court need not pass on defendants' contention that Carto and Liberty Lobby are "libel-proof." *See, e.g., Simmons Ford, Inc. v. Consumers Union of the United States, Inc.,* 516 F.Supp. 742 (S.D.N.Y. 1981). Libel-proof plaintiffs are those whose reputation is so besmirched, either from uncontested portions of the allegedly libelous publication or from other events occurring prior to the challenged publication, that as a matter of law such plaintiffs would be unable to recover for further damage to reputation.

A second issue that need not be decided by this Court has to do with the proper choice of law. Both sides to this suit, in repeatedly citing *Nader v. de Toledano,* 408 A.2d 31 (D.C. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980), seem to assume that the law of the District of Columbia applies. However, at least with regard to Carto, a resident of California, it is possible that California law applies. Under Restatement 2d, Conflict of Laws § 150(2), in multistate defamation cases the applicable law is usually that of the state where plaintiff was domiciled at time of publication, if publication occurred within that state. If California law were applicable, it might severely burden Carto's ability to recover anything more than nominal damages. Under California Civil Code § 48a, a plaintiff alleging libel in a newspaper may recover only special damages—i.e., damages resulting from loss in business or occupation, but not damages arising from loss of reputation, nor punitive damages—unless plaintiff seeks, in writing, a retraction within 20 days of publication.

Because the plaintiffs are unable to prove actual malice, the defendants are entitled to summary judgment on the libel claim.

*The Conversion Claim*

 The defendant Jack Anderson asserts that plaintiffs' claim of conversion is time barred and that the plaintiffs cannot rely on the fraudulent concealment doctrine to toll the statute of limitations. In their brief in opposition, the plaintiffs fail to make any argument to the contrary. Under Local Rule 1–9(d), the Court may thus treat Anderson's motion for summary judgment on count two as conceded.

The Anderson motion, however, has merit. The alleged conversion took place in 1966. D.C.Code § 12–301(2) provides for a three-year statute of limitations. Plaintiff knew or should have known of the theft of the files since 1969, when the first article in *True Magazine* mentioned the theft. Carto was familiar with the contents of the article, as revealed by his filing of the subsequent libel suit against the article's authors and publisher in 1970.[13]

Based on the foregoing, the defendants' motion for summary judgment is granted as to the entire complaint. An appropriate order follows.

### ORDER OF DISMISSAL AND JUDGMENT

On this date, the Court has entered a Memorandum Opinion, and on the basis thereof it is

ORDERED

The defendants' motion for summary judgment is granted and judgment is entered for the defendants.

The complaint is dismissed with prejudice.

13. *See* Affidavit of Willis A. Carto in Support of Plaintiffs' Opposition to Motion for Summary Judgment at ¶ 7, filed October 12, 1982.