**LIBERTY LOBBY, INC., et al., Appellants**

v.

**Jack ANDERSON, et al.**

**No. 83–1471.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1984.

Decided Nov. 2, 1984.

As Amended Nov. 2, 1984.

---

Mark Lane of the Bar of the Supreme Court of New York, pro hac vice by special leave of the Court, with whom Fleming Lee, Washington, D.C., was on the brief, for appellants.

Michael D. Sullivan, Washington, D.C., with whom David J. Branson and Leonard Appel, Washington, D.C., were on the brief, for appellees.

Before EDWARDS and SCALIA, Circuit Judges, and HARRIS,\* District Judge of the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Liberty Lobby, a not-for-profit corporation incorporated under the laws of the

---

\* Sitting by designation pursuant to 28 U.S.C.   § 292(a) (1982).

District of Columbia, and Willis Carto, its founder and treasurer, a citizen of California, brought this suit in the District Court for the District of Columbia against Bill E. Adkins, a Texas citizen, Jack Anderson, a Maryland citizen, and the Investigator Publishing Company, a corporation formed under the laws of the State of Texas.[1] Their suit, founded on diversity of citizenship, 28 U.S.C. § 1332 (1982), charged that the defendants had libeled them in two articles printed in the October 1981 issue of *The Investigator* magazine, which was published by Jack Anderson. The District Court granted summary judgment for the defendants, *Liberty Lobby, Inc. v. Anderson*, 562 F.Supp. 201 (D.D.C.1983), and the plaintiffs now appeal.[2] The appeal presents issues regarding the asserted doctrine of a "libelproof" plaintiff, *i.e.*, one whose reputation has already been so damaged that further defamation can do no harm; the assertion that a pre-publication warning of falsity given by the plaintiff establishes the malice necessary to sustain judgment on behalf of a public-figure plaintiff; application of the "clear and convincing evidence" standard and the requirement of independent judicial determination of actual malice to a motion for summary judgment; and, of course, the merits consideration (under summary judgment standards) of whether the allegations were factual (as opposed to opinion), were defamatory, were false, and were made in good-faith reliance upon reputable sources.

**I**

Three stories published in the October 1981 issue of *The Investigator* are relevant to this lawsuit. The shortest of them, "America's Neo-Nazi Underground: Did *Mein Kampf* Spawn Yockey's *Imperium*, a Book Revived by Carto's Liberty Lobby?," was written by Jack Anderson and contained four of the thirty statements identified in the complaint as defamatory. That piece was an introduction to the two other articles: "Yockey: Profile of an American Hitler," telling the story of Francis Parker Yockey, a lawyer and author who took his own life in 1960, and "The Private World of Willis Carto," the source of the remainder of the statements identified as defamatory.

The "Yockey" and "Private World" articles were written by Charles Bermant, although the former appeared under the byline of the magazine's staff writer Jon Obert, because Anderson did not like more than one piece attributed to a single author in any issue. Bermant joined Anderson's staff in March 1981, having previously worked in Anderson's office as an intern, but the story, according to the appellants, began much earlier. In November 1969, Joseph Trento and Joseph Spear published an article in *True* magazine entitled "How Nazi Nut Power Has Invaded Capitol Hill."[3] Carto and Liberty Lobby sued *True*, claiming that the article defamed them. The lawsuit ended with a settlement under which *True* paid Carto a sum of money and published a favorable article about Liberty Lobby. In May 1981, Spear was working for Anderson, now as the Managing Editor[4] of *The Investigator*. He assigned Bermant to investigate the Yockey and Carto stories and, plaintiffs claim, gave him drafts containing the state-

---

**1.** Two other employees of the Investigator Publishing Company were also named in the original complaint, but have since been dismissed from the suit.

**2.** Anderson's counterclaim, in which he claimed that he had been defamed by Liberty Lobby, and the second count of the plaintiff's complaint, asserting a conversion of Liberty Lobby's files, were both dismissed by the District Court with no appeal taken.

**3.** At oral argument, counsel for the appellees conceded that when the *True* article was pub-

lished, Trento and Spear worked for Jack Anderson. Jan. 20, 1984 Tr. at 33–34.

**4.** In their briefs, both sides identify Spear as the magazine's managing editor, although he was listed as an associate editor on the masthead of the October 1981 issue. Regardless of title, he was in a position of authority over Bermant, also listed on the masthead as an associate editor.

ments made in the *True* article from which to work. Appellants' Brief at 29–30. Although the affidavit that Bermant filed with the district court does not list the Trento and Spear articles as a source, *see* Bermant Affidavit at ¶¶ 8–17, the detailed appendix to the affidavit does identify it as a source, occasionally as the sole source, for some of Bermant's claims. *See, e.g.,* Bermant Affidavit Appendix at 16–17.

Bermant conducted other research, which the district court characterized as "exhaustive" and "thorough[]." 562 F.Supp. at 206, 209. He reviewed the products of a Freedom of Information Act request, sought information about Carto and Yockey in libraries, and interviewed a number of people. One of his major sources was Robert Eringer, a freelance journalist; several of the allegedly defamatory statements were based solely on Eringer's claims. Bermant never met Eringer and his deposition recounts only one telephone conversation with him. Eringer sent Bermant a draft of an article containing some information about Liberty Lobby. That draft has since been lost, probably "thrown away." Bermant Deposition at 71–72. Eringer never identified any of his sources to Bermant, nor did Bermant inquire. Anderson testified that it did not matter to him whether Eringer was reliable, for "[w]e did not intend to use his material." Anderson Deposition at 51. Eringer, believed at the time of the proceedings below to live in London, was not deposed for this lawsuit. Another of Bermant's major sources was William Cox, an attorney representing a plaintiff who had sued an organization related to the appellants in the California courts.[5] Bermant interviewed Cox and also relied on the "Declaration of William Cox Regarding the Urgency of the Proceedings," a document apparently produced for the California lawsuit.

Bermant "spent ... several days" writing first drafts of the articles, which were then edited by Obert. Bermant Affidavit at ¶ 17. There is evidence that several of the allegedly defamatory statements were added to the "Private World" article during the editing process. Bermant Deposition at 119. *The Investigator*'s art department produced several illustrations for the issue—two of which are also subjects of defamation claims.

Before the issue was published, William McGaw, editor of *The Investigator,* told the magazine's president that the articles were "terrible" and "ridiculous." He also viewed the illustrations and informed the art director that they "could be libelous." McGaw Affidavit at ¶¶ 13, 17. Also before the issue was published, the appellants delivered written notification to the appellees of those statements they thought were defamatory, without apparent effect.

The articles, analyzed in detail in Parts IV and V of this opinion, convey the message that Carto is racist, fascist, anti-Semitic, and a neo-Nazi, and that Liberty Lobby was established to pursue his goals. The introductory article, written by Anderson over the by-line "The Editors," stated that upon Yockey's death Carto was able "to pick up the torch and fan it into a prairie fire." His strategy "[t]o capture political power" was "to put a benign face on his operation.... Thus Carto called his base organization Liberty Lobby." The "Private World" article was to the same effect. It asked, for example, such rhetorical questions as whether "Carto's opinions march goosesteps beyond the pale of responsible American conservatism?"; repeated such claims of others as the assertion that Carto was "the leading anti-Semite in the country"; and, in words and illustrations, noted that Carto physically resembled and emulated the mannerisms of Hitler.

Carto and Liberty Lobby filed suit on September 15, 1981, challenging two of the

---

5. Cox's client, Mermelstein, sued the Institute for Historical Review, an organization associated with Carto. The Institute had offered an award of $50,000 to the first person able to prove that Hitler's mass extermination of Jews had occurred. Mermelstein claimed the prize, and the Institute allegedly refused to pay.

illustrations and twenty-eight statements contained in the articles, including some of the statements repeated above.

## II

We turn first to arguments which both parties bring forward as a means of avoiding the difficult inquiry into the issues of falsity and malice. Appellees ask us to affirm the grant of summary judgment without further ado because the appellants are, on two theories, "libel-proof." First, they claim that the reputations of Liberty Lobby and Willis Carto have been irreparably strained by prior publications. Whether these prior publications are truthful is not relevant, they assert, because the tort of libel, which redresses injury to reputation, has no application when the plaintiff, for whatever reason, has a reputation that cannot be damaged.

[1] We are not yet ready to adopt for the law of libel the principle that 10,000 repetitions are as good as the truth. We see nothing to be said for the rule that a conscious, malicious libel is not actionable so long as it has been preceded by earlier assertions of the same untruth. To begin with, we cannot envision how a court would go about determining that someone's reputation had already been "irreparably" damaged—*i.e.*, that *no* new reader could be reached by the freshest libel. More important, however, no significant First Amendment values would be furthered by the rule appellees suggest, since, where a person has been widely libeled by reputable sources, the defendant's *good faith* reliance upon those sources provides, as we shall later discuss, a complete defense. Proving such good faith reliance (or actually, even less than that, merely preventing the plaintiff from proving the opposite by

"clear and convincing evidence") is not such a burden that a prophylactic rule need be adopted sanctioning willful character-assassination so long as it is conducted on a massive scale.

█ The appellees' second libel-proof theory is somewhat different. They claim that the unchallenged portions of these articles attribute to the appellants characteristics so much worse than those attributed in the challenged portions, that the latter cannot conceivably do any incremental damage. This apparently equitable theory loses most of its equity when one realizes that the *reason* the unchallenged portions are unchallenged may not be that they are true, but only that appellants were unable to assert that they were willfully false. In any event, the theory must be rejected because it rests upon the assumption that one's reputation is a monolith, which stands or falls in its entirety. The law, however, proceeds upon the optimistic premise that there is a little bit of good in all of us—or perhaps upon the pessimistic assumption that no matter how bad someone is, he can always be worse. It is shameful that Benedict Arnold was a traitor; but he was not a shoplifter to boot, and one should not have been able to make that charge while knowing its falsity with impunity. So also here. Even if some of the deficiencies of philosophy or practice which the appellees' articles are lawfully permitted to attribute to the appellants (which is not necessarily to say they are true) are in fact much more derogatory than the statements under challenge, the latter cannot be said to be harmless. Even the public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential. ("He was a liar and a thief, but for all that he was a good family man.")[6]

None of the opinions the appellees cite—all decisions of federal courts interpreting

---

**6.** There may be validity to the proposition that at some point the erroneous attribution of incremental evidence of a character flaw of a particular type which is in any event amply established by the facts is not derogatory. If, for example, an individual is said to have been

convicted of 35 burglaries, when the correct number is 34, it is not likely that the statement is actionable. That is so, however, not because the object of the remarks is "libel-proof," but because, since the essentially derogatory implication of the statement ("he is an habitual bur-

state law in the absence of state court guidance—extend the libel-proof doctrine as far as appellees would go. In fact, the Second Circuit, an early proponent of the doctrine, has narrowed it to the facts presented in its earlier cases. *See Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976). Because we think it a fundamentally bad idea, we are not prepared to assume that it is the law of the District of Columbia; nor is it part of federal constitutional law.

■ Appellants, for their part, argue that we can dispense with inquiry into the existence of actual malice, *see* pages 1573–1577, *infra*, because that element of liability is automatically established (to a degree sufficient to go to the jury) by the fact that appellees proceeded with these publications despite a warning from appellants that the articles were defamatory and a demand that they not be printed. These were allegedly contained in a letter to Jack Anderson which was "as explicit and detailed as the complaint filed in this matter," Appellants' Reply Brief at 6. It may be enough to note that that letter was not mentioned in the plaintiffs' papers in opposition to summary judgment, and is not part of the record on this appeal. Even if it were before us, however, the letter as described could not conceivably constitute, in and of itself, sufficient evidence of malice to overcome a summary judgment motion. That effect might be achieved by a prior notice citing specific, verifiable facts contradicting the allegations so directly as to cause any reasonable person to conduct further inquiry; but mere general allegations of falsity similar to those contained in the complaint do not suffice. If the case reaches the jury, of course, such a notice can be considered as evidence of malice along with other factors—but standing alone it cannot take the case there.

### III

We must address, then, whether the District Court properly granted the defendants' motion for summary judgment on the ground that all the elements of libel had not been adequately established. The nature of those elements is not in dispute, but the degree of certitude with which one of them had to be established, and the nature of the judgment that the District Court was to bring to bear upon it (*i.e.*, independent or deferential) will require some discussion.

■ Appellants do not question the District Court's ruling that they were so-called limited purpose public figures, and that the alleged libels pertained to the area in which they held this status. This means that, as a constitutional matter, in order to recover damages from these media defendants, the plaintiffs had to prove that they acted with actual malice. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). Actual malice is not simply ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *Id.* at 328, 94 S.Ct. at 3001. The test is not an objective one, for the Supreme Court has noted that

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (emphasis added). This does not mean, of course, that actual malice cannot be proved inferentially. The plaintiff need not obtain an admission of fault from the defendant.

---

glar") is correct, he has not been libeled. That issue is not presented here, both because *none* of the repulsive attributes which the appellees imputed to the appellants have been established or conceded to be true, and because the state-

ments which we find to have been improperly taken from the jury impute attributes which, while less heinous than those for which the appellees have a good-faith defense, are nevertheless quite separate and distinct from them.

Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.

*Id.* at 732, 88 S.Ct. at 1326.

■ To prevail in a libel trial, not only must the public-figure plaintiff prove the existence of actual malice; he must prove it with "convincing clarity," *New York Times v. Sullivan,* 376 U.S. 254, 285–86 (1964), or to use the Court's more recent language, with "clear and convincing proof," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). Moreover, judges are not merely to determine whether the finder of fact could reasonably find such "convincing clarity" to exist, but are "independently [to] decide" that point, "as expositors of the Constitution." *Bose Corp. v. Consumers Union,* —— U.S. ——, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). The issue we address in this portion of our opinion is whether these requirements of "convincing clarity" and "independent judicial determination" apply at the summary judgment stage. Even though this is a diversity case, that issue is governed by federal law—either because the Constitution imposes the more demanding requirements at the summary judgment stage, or because, if it does not, the matter is determined by the rules of the forum court under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Anchorage-Hynning & Co. v. Moringiello,* 697 F.2d 356, 360 (D.C. Cir.1983) (applying *Erie* to the District of Columbia); *see Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir.1982).

■ With regard to the "clear and convincing evidence" requirement, the issue can be framed as follows: whether, in order to deny the defendant's motion for summary judgment, the court must conclude that a reasonable jury not only could (on the basis of the facts taken in the light most favorable to the plaintiff) find the existence of actual malice, but could find that it had been established with "convincing clarity." We conclude that the answer is no. Imposing the increased proof requirement at this stage would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well. It would effectively force the plaintiff to try his entire case in pretrial affidavits and depositions— marshalling for the court *all* the facts supporting his case, and seeking to contest as many of the defendant's facts as possible. Moreover, a "clear and convincing evidence" rule at the summary judgment stage would compel the court to be more liberal in its application of that provision of FED.R.CIV.P. 56(e) which states that the court "may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." In other words, disposing of a summary judgment motion would rarely be the relatively quick process it is supposed to be. Finally, if summary judgment were supposed to be based on a "clear and convincing" standard, it is hard to explain the Supreme Court's statement questioning the asserted principle that in public figure libel cases "summary judgment might well be the rule rather than the exception," and affirming to the contrary that "[t]he proof of 'actual malice' ... does not readily lend itself to summary disposition." *Hutchinson v. Proxmire,* 443 U.S. 111, 120 & n. 9, 99 S.Ct. 2675, 2680 & n. 9, 61 L.Ed.2d 411 (1979). There is slim basis for such a statement if, in order to survive a motion for summary judgment, the plaintiff must establish an arguably "clear and convincing" case.

We believe, in short, that application of the "clear and convincing evidence" consti-

tutional standard in public figure libel cases is similar to application of the "beyond a reasonable doubt" constitutional standard in criminal cases. There, "probable cause" is sufficient to take the case to trial, *see Brown v. Department of Justice*, 715 F.2d 662, 667 (D.C.Cir.1983), and the heightened standard applies only after the government has had an opportunity to present its full case, *United States v. Davis*, 562 F.2d 681, 683–84 (D.C.Cir.1977) (on motions for acquittal, court must determine whether there is any evidence "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt").

We realize that some other courts have expressed a different rule. *See, e.g., Yiamouyiannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir.1980) ("a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury *could find* malice with convincing clarity,'" *quoting Nader v. de Toledano*, 408 A.2d 31, 50 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)). Those formulations were set forth, however, with no analysis of the point here discussed. In fact, the courts' attention was directed to the question of whether the normal procedural standard governing summary judgment applied (*i.e.*, the test "could a reasonable jury find," as opposed to some test more favorable to the defendant) rather than to the question of what burden of proof that standard should be applied to. Moreover, those courts' analyses of the facts demonstrate that they rested their decisions upon lack of evidence of malice, not upon lack of "convincing clarity" in that evidence. *See Yiamouyiannis v. Consumers Union, supra*, 619 F.2d at 942 ("no showing has been made that they were published with actual malice, let alone a showing that achieves 'convincing clarity'"); *Nader v. de Toledano, supra*, 408 A.2d at 56 ("[i]n sum, ... we agree with the trial court that appellant has demonstrated no genuine issue of fact as to whether Copley had reason to doubt de Toledano's veracity").

With regard to the *Bose* requirement of independent judicial determination we reach the same conclusion, for the same compelling practical reason: it is simply incompatible with the preliminary nature of the summary judgment inquiry. If it were to be applied at that early stage, summary judgment would be converted from a search for the minimum amount of evidence that could persuade a reasonable person into the final assessment of "actual malice" by the court itself—final, at least, if the court concludes actual malice has not been established. That would compel the plaintiff to present his full case prematurely, with the undesirable consequences described above. In addition, courts of appeal would be burdened with the unusual task of making the largely factual determination of actual malice in many cases where a judge or jury verdict against the plaintiff would render that unnecessary.

For the foregoing reasons, we believe that the constitutional requirements of "clear and convincing" proof and independent judicial determination of the ultimate issue of actual malice are to be applied only after the plaintiff has had an opportunity to present his evidence. We thus agree with the two-stage approach set forth by Judge Wright, joined by Judge Robinson, in his concurrence in *Wasserman v. Time, Inc.*, 424 F.2d 920, 922 (D.C.Cir.), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970):

> Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant....
>
> If the case survives the defendant's summary judgment motion, the trial court at the close of the plaintiff's case must decide whether actual malice has been shown with "convincing clarity."

■ One further clarification is needed: In reviewing the district court's application of the foregoing principle, we do not defer

to its conclusions and reverse only if they are clearly erroneous. Since in granting or denying summary judgment a district court by definition makes a determination of law rather than fact, we review the matter anew. *Western Casualty & Surety Co. v. National Union Fire Insurance Co.*, 677 F.2d 789, 791 n. 1 (10th Cir.1982).

## IV

### A. *Nondefamatory Allegations*

██ We proceed, then, to a discussion of the merits. Preliminarily, we can eliminate from our inquiry those statements asserted to be false in the Complaint which cannot, as a matter of law, be libelous since they do not "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," RE-STATEMENT (SECOND) OF TORTS § 559 (1977). The plaintiffs' challenges to the following numbered allegations represent no more than a charge of journalistic inaccuracy, which is not an actionable fault:

3. Assertion that Liberty Lobby is tax exempt.

4. Assertion that Yockey's book *Imperium* is "circulated only among the elect"; that Carto's admiration for Yockey is a "secret thing"; and that Carto "hides in the shadows of reclusion and anonymity."

10. Use of word "drifting" to describe Carto's movement among various right-wing groups. (Even if this can be thought sufficiently derogatory to be actionable, it is a characterization which would qualify as an opinion and thus be protected. *See* Section B below.)

12. Assertion that Liberty Lobby's magazine, *The Spotlight*, "boasts 335,000 *readers*," when in fact it had a *paid circulation* of 335,000.

18. Description of Jeremy Horne as a veteran employee.

### B. *Opinions*

██ We can also eliminate from our consideration three other allegations, which are constitutionally protected opinion, and therefore not actionable. In *Gertz v. Robert Welch, Inc., supra*, the Supreme Court stated that:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

418 U.S. at 339–40, 94 S.Ct. at 3006–07. Since opinions cannot be false, they cannot be the basis of a defamation action. While it is often difficult to draw a line between statements of fact and opinion, *see, e.g., Ollman v. Evans*, 713 F.2d 838 (D.C.Cir. 1983), *vacated*, October 6, 1983, *reh'g en banc*, March 6, 1984, we are of the view that the following numbered allegations qualify as the latter:

7. Description of Carto as seeking to "destabilize society," and to "create[ ] a climate of fear and danger," in order to "seize real political power."

30. Statement that Carto's appeal to "American traditions" is inconsistent with the racial, ethnic and religious equality central to the "American idea." [7]

There are no objective criteria by which the truth or falsity of these statements can be evaluated. A proposal to eliminate what one favors in the social structure is "destabilization," and to eliminate what one opposes is "progress." One man's "climate of fear and danger" is another man's "realistic assessment of the perils that confront us." The essence of the "American idea,"

---

**7.** To the extent other portions of this allegation contained the imputation that Carto supported racial and religious bigotry, the good-faith defense discussed below in connection with allegation 5 was applicable, *see* pages 1575–1576, *infra.*

and what is or is not consistent with it is preeminently a matter for political (*i.e.,* opinionated) debate rather than scientific inquiry.

In our view, all of the assertions in allegation 25 except those repeated elsewhere [8] also qualify as opinion. Since, with regard to one of the assertions, this assessment depends heavily upon context, we set forth that allegation in full.

"In this scrutiny of Willis Carto and what he represents, five of the characteristics John Roy Carlson said identify inherent or incipient fascism have manifested themselves in greater or lesser degree. They are; [*sic*] a virulant anti-Semitism to dissolve the social fabric; the pitting of group against group and race against race to weaken national unity; incessant Red-baiting to smokescreen fascist propoganda [*sic*]; superpatriotism and a perverted brand of nationalism; and the creation of a 'survivor mentality' to further fragment society. Three other characteristics are also evident in the Carto record; the use of lies and half-truths to win the support of the politically ignorant; adulation of Adolf Hitler; denigration of democracy and agitation for an authoritarian New Order."

What one person may consider "the pitting of group against group" another might regard as the championing of minority rights or opposition to exorbitant and divisive minority demands. What is "Red-baiting" or "superpatriotism" or "perverted nationalism" to some may seem no more than appropriate awareness of Communist subversion and love of country to others. Whether a person is creating a "survivor mentality" or merely urging sensible immediate precautions surely depends upon one's estimation of how close the world is to the brink of disaster. Whether democracy is

being "denigrated" depends upon what elements one considers central to that political form, and except to the anarchist what is "authoritarian" is necessarily a matter of political judgment and degree. As for "fascism": Although that word has a particular meaning in political science discourse, in the arena of political commentary we are engaged in here it has long been used to describe nothing more specific than right-of-center views of which the writer disapproves.[9] *See Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir.1976). We have no difficulty in denominating all of the statements relating to these terms as statements of opinion.

The statement that Carto's record was characterized by "the use of lies and half truths" is more problematic, but we are of the view that in this context it constitutes a statement of opinion as well. The assertion that a person has "lied" in the sense of intentionally making a misrepresentation of fact is unquestionably defamatory. *See* 50 Am.Jur.2d *Libel and Slander* § 89 (1970). It seems to us, however, that when a charge of unspecified "lies and half truths" is made in the midst of a paragraph making such opinionated indictments as "fascism," "Red-baiting," "perverted nationalism," and "denigration of democracy," the reader would not be justified in believing that the misrepresentations referred to are distortions of demonstrable fact rather than distortions of similar political assessments which the opinionated writer takes to be as unquestionable as fact—for example (to hypothesize a few that would fit in nicely with the rhetoric of this case), whether the Communist world intends to "bury us," or whether Adolph Hitler saved Europe from Communism. This interpretation is suggested not merely by the statements with which the charge of "lies and half truths"

---

**8.** The portions of this allegation asserting anti-Semitism and adulation of Hitler are subject to the good-faith defense. *See* the discussion of allegations 5 and 6, page 1576, *infra*.

**9.** George Orwell commented on this phenomenon in 1946: "Many political words are ... abused. The word *Fascism* has now no meaning except in so far as it signifies 'something not desirable.'" G ORWELL, *Politics and the English Language,* in A COLLECTION OF ESSAYS 162 (1953).

is surrounded, but also by the fact that the asserted purpose of the "lies and half truths" is to "win the support of the *politically ignorant*" (emphasis added), rather than "to deceive the uninformed." As recently stated by an Illinois court:

> The allegation that a public figure is a "liar" can be seen as a factual assertion unprotected by absolute privilege when the derogatory remark is laden with factual content, as opposed to mere name-calling.

*Costello v. Capital Cities Media, Inc.*, 111 Ill.App.3d 1009, 1016, 445 N.E.2d 13, 18 (1982). In the present case the alternative to factual content is not name-calling, but rather political opinion—and we think it is with the latter that the remarks were laden. We emphasize it is not our holding that specific factual assertions are immunized from defamation liability by accompanying political rhetoric; but that the politically rhetorical context of vague and ambiguous assertions (Carto uses "lies and half-truths") can determine their meaning as opinion rather than fact.

### C. *Allegations Unaccompanied by Evidence of Malice*

▮ As to those challenged statements that could be defamatory, and were factual, appellees' defense was based not upon truth of the assertions but upon good-faith reliance on reputable sources. If established, that unquestionably eliminates the necessary element of actual malice. Inquiry into the question, however, cannot be conducted in gross. It is the individual allegedly libelous statement (taken in its proper context) rather than the accuracy of the publication as a whole, which is on trial. A falsehood published with actual malice is no less actionable for being surrounded by an array of well documented and carefully researched allegations. The accompanying truth cannot eliminate the libel, and is indeed the most effective means of increasing its harm by increasing its credibility. The district court appears to have acknowl-

edged this principle, since it found that "the information contained within [Bermant's] sources substantiates each allegation contained in the articles," 562 F.Supp. at 209.

We turn first to the two remaining statements (not already disposed of as nonlibelous in our earlier discussion) contained in the introductory article. That article was written in its entirety by *Anderson*, rather than Bermant—so that Bermant's affidavit setting forth published sources that "I relied upon" for these statements cannot be regarded as demonstrating good-faith reliance of the author. It is true that the Appendix to the Bermant affidavit states, unlike the body of the affidavit, that it sets forth the authorities upon which "defendants" (rather than "I") relied—but in view of the contradictory statement in the body of the affidavit, that is not a sufficiently clear allegation that *Anderson* relied upon these authorities to sustain summary judgment. Indeed, it is questionable whether the second-hand assertion of Bermant as to what was in Anderson's mind would meet the requirement of FED.R.CIV.P. 56(e) that affidavits "be made on personal knowledge, ... set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein."

Nonetheless, in light of the manner in which, according to uncontroverted evidence, the Anderson introduction was written, we think no reasonable jury could find that Anderson personally acted with actual malice *with regard to statements whose defamatory content does not go beyond statements made by Bermant in one of the last two articles*. Bermant's deposition stated that "he [Anderson] was given finished drafts of both [the second and third] pieces and took certain facts and quotes out and ... based on or coupled with his own knowledge and his own background, wrote the introduction." Bermant Deposition at 97. Anderson's deposition (at 107) stated that in preparing the introduc-

tion "I had no independent information. I based it on the information in front of me. So I was relying ... on the reporters who work for us.... I took material either from the two articles or asked someone else to prepare a bridge which I disliked and then rewrote." Anderson was entitled to rely upon Bermant's research, unless he had reason to doubt Bermant's accuracy. No such reason was presented by the record here.[10]

As it happens, both of the remaining defamations attributed to the Anderson article are reformulations of Bermant's allegations, some of which are challenged here and some of which are not. Both the reference to "America's neo-Nazi underground" (allegation 1) and the reference to "a more sinister neo-Nazi cabal, men of influence and cunning, lurk[ing] in the shadows" (allegation 2) find support in such assertions made by the "Private World" and "Yockey" articles as the assertion that "Carto [was] a Hitler fan" and "Liberty Lobby was 'infiltrated by Nazis who revere the memory of Hitler'" (allegation 6); and the assertion that the admirers of Yockey's book *Imperium,* among whom Carto is identified, constitute "a neo-Nazi underground," whose members "control a pub-

lishing-propaganda network stretching to the far corners of America" (unchallenged assertion). Allegations 1 and 2, therefore, are nonactionable on the basis of Anderson's actual malice. Whether they are actionable under the doctrine of *respondeat superior* against Anderson or any other defendant, on the basis of Bermant's actual malice, *see Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 539 n. 19 (7th Cir.1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983), depends upon the outcome of our inquiry into Bermant's good faith reliance on other sources, particularly with regard to allegations 6 and 9, as discussed below.[11]

We turn, then, to the remaining statements in Bermant's articles, to determine whether, as to each, the trial court's finding of exculpating reliance upon reputable sources was correct. The plaintiffs' theory is that some of the defendants' sources were inherently unreliable, and since a jury can infer that Bermant was aware of this fact, Bermant's protestations that he had no malicious intent are insufficient to support summary judgment.[12]

█ We find that summary judgment was proper for those statements which

---

**10.** Even if there was evidence indicating that Anderson knew of the *True* libel suit, *see* note 3, *supra,* nothing suggests that he thought Bermant was relying exclusively upon the *True* article as a source for these allegations—as in fact Bermant was not.

**11.** The judgment of the District Court was based exclusively upon absence of malice on the part of any defendant. We have not been asked to consider, nor do we express any opinion upon, the principal-agent relationship among the various defendants. The precise relationship between Anderson and Bermant, for example, is unclear. *Compare* Anderson Deposition at 42 ("Q: Was [Bermant] ... an employee of yours or of Jack Anderson Enterprises? A: No.") *with* Bermant Deposition at 9 ("Q: Who pays you for your work? In other words, who signs the checks? A: Jack Anderson.").

In the District of Columbia an employer can be held liable for torts committed by employees acting within the scope of their employment. *See Jordan v. Medley,* 711 F.2d 211, 213 (D.C.Cir. 1983); *Smith v. District of Columbia,* 399 A.2d

213, 215 n. 3, 221–22 (D.C.1979) (slander case); RESTATEMENT (SECOND) OF AGENCY § 247 (1958).

**12.** For a discussion of the inconclusiveness of "self-serving, albeit plausible" affidavit statements regarding intent, see *Stewart v. Credit Bureau, Inc.,* 734 F.2d 47, 54–55 (D.C.Cir.1984). There, although the affidavit was "uncontested," we held that because the record "manifest[ed] enough possibility" that the self-serving affidavit statement was incorrect the court properly did not conclude its inquiry with the affidavit, but instead permitted the matter to be explored at trial. Likewise here, Bermant's assertion that he acted without actual malice does not end our inquiry. There is no inconsistency in our accepting, for purposes of the summary judgment decision, Bermant's self-serving statements as to the sources he relied upon. The fact that he relied upon a concededly existing source is not at all likely to be disproved by circumstantial evidence, whereas the fact that he *believed* what the source said *is*—for example, by evidence that many other sources which he must have been aware of said the opposite.

Bermant could show were based on reports previously published in reputable sources. Many of the claims contained in *The Investigator's* stories were not new. They had been made in previous articles about Carto and the Liberty Lobby. Bermant's sworn statement claimed that he relied on these published sources, and the appellants' evidence did not dispute that. Since the plaintiffs adduced nothing that would permit a jury to conclude that Bermant had reason to doubt these published sources and had therefore acted with actual malice, we think summary judgment was appropriate. The following numbered allegations are in this category.

5. Allegation that Carto is "the leading anti-Semite in the country." Many published sources, from Anti-Defamation League publications to *The National Review*, claimed Carto and Liberty Lobby are anti-Semitic. (The prominence of Carto in this regard—whether he is "the *leading* anti-Semite"—is, if derogatory apart from the anti-Semitism itself, a matter of opinion.)

6. Reference to Carto as a "Hitler fan" and assertions that Liberty Lobby was "infiltrated by Nazis." A prior Drew Pearson publication referred to Liberty Lobby as "a nest of Nazis"; a statement by Rep. Eilberg in the *Congressional Record* and the Cox Declaration in the *Mermelstein* lawsuit described Carto's admiration of Hitler.[13]

8. Allegation of anti-Semitism. *See* allegation 5.

9. Neo-fascist [Yockey] as Carto's role model. Carto's introduction to *Imperium* adequately supports the claim that Yockey was Carto's role model, inasmuch as the defamatory content of that claim (if any) consists of the implication that Carto admired Yockey's ideas: "I was in the presence of a great force .... [W]e understood that I [Carto] would not desert him." The claim that Yockey was a "neo-fascist" was supported by several publications, and is in any case opinion, *see* page 1573, *supra*.

16. Allegation of anti-Semitism. *See* allegation 5.

20. Purpose of establishing the Institute for Historical Review was to disprove Hitler's mass extermination of Jews. This was supported in substance by an article in the Long Beach Press-Telegram and by the Cox declaration filed in the *Mermelstein* lawsuit.

21. Details of Mermelstein-Institute for Historical Review lawsuit. This was supported by the Cox declaration filed in the lawsuit, and by a *Los Angeles Times* story about the controversy.

26. Attribution to *Spotlight* of the term " 'Jew-Zionist' international bankers." The derogatory content was sufficiently supported by (1) numerous published allegations of anti-Semitism, *see* allegation 5, and (2) *Spotlight's* claim that the energy crisis was the result of "Israel in cahoots with the multinational corporations."

28. Allegation that a fine was levied against Liberty Lobby by the FEC. This was supported by an article in *Spotlight*.

■ We also find that summary judgment was proper for those statements

---

13. Appellants assert that the unreliability of Cox and therefore the malice of Bermant follows automatically from the fact that Cox had been involved in a lawsuit against Liberty Lobby. We do not agree. It is assuredly not the case that every journalistic reliance upon the version of a story given by one of the protagonists demonstrates malice. The Cox assertions relied on here (*see,* in addition to the present allegation, allegations 20 and 21, *infra*) were directly supported by at least one other (impartial) source, and were given plausibility by allegations of neo-Nazism and anti-Semitism from many other sources.

which Bermant's affidavit asserted were based on *unpublished* interviews with Robert Bartell and Irving Suall, specifically the following:

22. Statement that Carto, "outraged over whistle blowing," required employees to submit to lie detector tests as a condition of employment, attributed to Robert Bartell, Chairman of Liberty Lobby's Board of Policy.

24. Statement that a plan, called "Operation Survival," was a plan to establish a dictatorship, attributed to ADL official Irving Suall.

Each of these individuals occupied a position or engaged in activities which made it reasonable to believe that he was knowledgeable concerning the matters relating to Liberty Lobby or Carto to which the attributed statement pertains. Each, moreover, was available (and ample time was provided) for deposition by plaintiffs which could establish that the interview had not occurred, that the statement had not been made, or that the subject of the interview could not reasonably have been thought to be a reliable source. In these circumstances we do not believe that the plaintiffs' mere general assertion that these statements were false and were maliciously published suffices to overcome the good-faith defense established by Bermant's affidavit.

## V

The district court was correct in entering summary judgment in favor of the appellees on the foregoing twenty-one allegations, and we affirm its findings. As to each of them, one element of the cause of action—either defamatory content, factual nature or malice—is absent.[14] Our examination of the record, however, reveals that a jury could reasonably conclude that the nine remaining allegations were defamatory, false, and made with actual malice. As to these claims, then, we must reverse and remand to the district court. *See* J. MOORE & J. WICKER, 6 Pt. 2 MOORE'S FEDERAL PRACTICE ¶ 56.27[1] at p. 56–1560 (2d ed. 1982) (remand for limited issues in dispute proper). *See, e.g., McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 717 F.2d 1460 (D.C. Cir.1983).

■ Allegation 11 asserts that Liberty Lobby occupies a building in Washington, D.C., owned by the Government Educational Foundation, "[t]he chairman and owner of [which] is Willis Carto, who bought the building with money contributed by many of Liberty Lobby's members in response to an urgent appeal"; and that Liberty Lobby pays the Government Educational Foundation $6,000 per month rent. The implication is that Carto is deriving personal profit from an excessive rental to Liberty Lobby. The plaintiffs deny all elements of the allegation, asserting that the building is not owned by the Government Educational Foundation, that Carto is neither chairman nor owner of that organization, and that Liberty Lobby pays no rent for the building. The sources allegedly relied upon by Bermant (other than Eringer, whose reliability for purposes of the good-faith defense is inadequate, as we shall discuss below) do not assert ownership of the Foundation by Carto or the payment of any rent, much less a specific figure of $6,000. It is for a jury to determine the truth or falsity of these matters and whether, if false, they are defamatory. On the basis of evidence adduced at this stage, it is impossible to say that no actual malice could be found.

■ Allegation 15, in addition to once more characterizing Carto's movement

---

14. We have not discussed separately the contention that the juxtaposition of an article entitled "The Private World of Willis Carto" to an article about an alleged "American Hitler" (to wit, Yockey) is defamatory. In light of what we have found regarding the nonactionability of allegations regarding Carto's admiration of Hitler, *see* discussion of allegation 6 at page 1576, *supra,* and also Carto's acknowledged admiration of Yockey, *see* discussion of allegation 4 at page 1572, *supra,* there is no substance to this claim.

among various right-wing groups as "drifting" (a statement we have disposed of in the context of another allegation earlier, *see* page 1572, *supra*), asserted that Carto "organized and promoted the Joint Council for Repatriation. What he meant by 'repatriation' was the forced deportation of all blacks to Africa." The published sources relied upon by defendants support the assertion that Carto created this organization, and that its purpose was to "send[ ] American blacks back to Africa." They do not establish, however, that the proposal envisioned "forced deportation"—in fact, to the contrary, one of them asserted that Carto (overtly at least) only sought "voluntary" repatriation. While the latter detail reduces not at all the repugnant racism of the scheme, it is possible to be a racist without being guilty of the quite separate fault of advocating the forced deportation of United States citizens. It is the distinction between the actions of White Citizen Councils, during the worst days of the civil rights struggle, in subsidizing bus fares for blacks willing to emigrate from the South, and the action of groups such as the Ku Klux Klan in driving blacks out by physical force. As far as racism is concerned, there is no distinction between the two, but the latter contains an additional and quite distinct repugnancy. Since the published sources referred to by the defendants not only do not establish this point but to the contrary assert that Carto's scheme was formally for "voluntary" repatriation, we think it is a jury question whether this allegation, if false, was made with actual malice.

■ We find that a jury could reasonably conclude that defamatory statements based wholly on the *True* article were made with actual malice. That article was the subject of a prior defamation action which was settled to Carto's satisfaction, a fact likely known to Bermant's editors, if not Bermant. Whether the particular statements relied on were false and whether the appellees were actually aware of that falsity are matters for a jury to determine. Allegation 19, the illustration suggesting that Carto emulated Hitler, and allegation 29, that Carto joined the singing of "Hitler's 'Horst Wessel Lied' " and delivered a speech in an attempt to emulate Hitler's style and charisma, were based solely on the *True* article. There is no other evidence that Carto emulates Hitler in appearance or in action, allegations the jury could find to be defamatory.

■ We turn next to the five allegations based solely upon the conversation with Robert Eringer:

13. Statement that Carto "conducts his business by way of conference calls from a public telephone," which arguably suggests criminality;

14. Claim that in 1968 a Carto front organization "used a direct mail blitz to support G. Gordon Liddy's Congressional campaign in New York" (since Liddy was later convicted of felony in connection with political activities, the allegation could be considered defamatory);

17. Illustration showing Carto secretly observing prospective employees through a one-way mirror;

23. One-way mirror allegation, in text;

27. Claim that a lead story in an issue of *The Spotlight* was a total hoax.

We find that a jury could reasonably conclude that Bermant made these allegations with a disregard for their truth or falsity that constituted actual malice. For one thing, there is only Bermant's word for the fact that Eringer ever said anything that supports the statements. The same was true for the statements, discussed earlier, attributed to Bartell and Suall—but as we noted, *see* pages 1576–1577, *supra*, those individuals were present at known locations in this country and could have been deposed by the plaintiffs, whereas the mysterious Mr. Eringer was thought to be somewhere in England. Moreover, Bermant's dealings with Eringer display a much lesser degree

of care, despite the scurrilous allegations for which he is the sole source. Bermant not only did not inquire how Eringer came to know these details of Carto's operations; he never even looked the unknown Eringer in the eye until after the story was published, but spoke to him only once over the telephone. Anderson admits that he did not care whether Eringer was reliable. These actions came close to the hypothetical case of actual malice the Supreme Court described in *St. Amant*: a story "based wholly on an unverified anonymous telephone call." 390 U.S. at 732, 88 S.Ct. at 1326. Eringer was identified by name, but he was in all other respects unknown to the appellees. These allegations, which defendants claim were based solely on Eringer's assertions, should have gone to the jury.

\*    \*    \*    \*    \*    \*

We affirm the District Court's grant of summary judgment as to all claims of defamation except those addressed in Part V of this opinion. As to the latter, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*