Anthony **HERBERT**,
**Plaintiff-Appellant-Cross-Appellee,**

v.

Barry **LANDO**, Mike Wallace, Columbia
Broadcasting System, Inc.,
**Defendants-Appellees-Cross-Appellants,**

**Atlantic Monthly Company,**
**Defendant-Appellee.**

Nos. 569, 570, Docket 85-7014, 85-7446.

United States Court of Appeals,
Second Circuit.

Argued Dec. 12, 1985.

Decided Jan. 15, 1986.

---

Jonathan W. Lubell, Lubell & Lubell, New York City (Mary O'Melveny, William O'Brien, M. Margaret Terry, of counsel), for plaintiff-appellant-cross-appellee.

Charles Rembar, Rembar & Curtis, New York City (Frank R. Curtis, Mark W. Budwig, of counsel), for defendant-appellee Atlantic Monthly.

Adria S. Hillman, Green & Hillman, New York City (Richard G. Green, Nancy S. Hobbs, of counsel), for defendant-appellee-cross-appellant Barry Lando.

David Boies, Cravath, Swaine & Moore, New York City (Pamela G. Ostrager, and Selene E. Mize, Coudert Brothers, on the brief; George Vradenburg, Ronald Guttman, CBS, Inc., of counsel), for defendants-

appellees-cross-appellants CBS, Inc. and Mike Wallace.

Before KAUFMAN, TIMBERS and NEWMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The First Amendment embodies one of our nation's strongest ideals, but in practice the principle itself has been subject to constant, unyielding attack. In media defamation law, there have been relentless demands for redress when the media appears to have exceeded the bounds of propriety. So it is that our courts, sensing that shackles on the press might be more easily imposed than lifted, have repeatedly refused demands that they restrict the scope of the First Amendment guarantees of free speech and a free press.

The Supreme Court recognized this principle and gave it the force of law in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This frequently cited case established the principle that a public official could not successfully sue a publisher for defamation unless it was published with "actual malice"—that is, knowing falsity or reckless disregard for truth or falsity. Later decisions emphasized that the rights of a free press, "while lodged in the reporter and his publisher, in reality reflect an underlying interest of the public," *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595 n. 12 (1st Cir.1980), and acknowledged that "the First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

## I. BACKGROUND

With these principles in mind, we confront for the second time in a decade this defamation action brought by Colonel Anthony Herbert against Columbia Broadcasting Systems ("CBS"), producer Barry Lan-

do, correspondent Mike Wallace, and the *Atlantic Monthly*. The prolonged and bitterly contested proceedings have come to a temporary halt upon the granting of partial summary judgment for the defendants and a complete dismissal of the action against the *Atlantic Monthly*, in a thoroughly reasoned and scholarly opinion by Judge Haight. Herbert appeals the dismissal and the granting of partial summary judgment. Lando, Wallace and CBS cross-appeal the denial of summary judgment on two alleged false and malicious statements.

The underlying facts of this case have been thoroughly explored by the courts on several previous occasions. *See Herbert v. Lando*, 568 F.2d 974 (2d Cir.1977), *rev'd*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Herbert v. Lando*, 596 F.Supp. 1178 (S.D.N.Y.1984); *Herbert v. Lando*, 73 F.R.D. 387 (S.D.N.Y.1977). Because our evaluation of the propriety of the district court's actions depends heavily on the facts, however, we once again recite the necessary, but briefer, history of the case and its procedural background. We are fortunate in having Judge Haight's meticulous exegesis of this litigation already set forth in his fine opinion, thus avoiding the need for a detailed explication of the facts.

This action was brought by Anthony Herbert, a retired Army officer who charged that he was relieved of command in Vietnam because he reported to his superiors war crimes and atrocities committed under the supervision of U.S. military personnel. Herbert, a highly decorated soldier who also had served in Korea, was on duty in Vietnam from September, 1968 to July, 1969. Between February 6 and April 4, 1969, Herbert commanded the 2d battalion of the 173rd Airborne Brigade. His superiors were General John Barnes, commander of the brigade, and Colonel J. Ross Franklin, deputy commander of the brigade.

On April 4, 1969, Barnes relieved Herbert of his command of the 2d battalion and reassigned him to the Capital Military Assistance Command in Saigon. Herbert protested his relief from command, claiming it was without justification. In Saigon, he

initiated a proceeding pursuant to Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, but was denied redress by a military board. Soon thereafter, Herbert was transferred back to the United States. On September 28, 1969—seventeen months after his relief from command—he filed formal charges with the Fort McPherson Inspector General's Office. Herbert alleged the 173rd Airborne Brigade had committed war crimes and atrocities, but that when he reported the war crimes to Barnes and Franklin, they failed to investigate the incidents. Herbert also claimed Barnes then relieved him of command because he had made the charges. The Army's Criminal Investigation Department launched three investigations into Herbert's allegations, but eventually exonerated Barnes and Franklin of all charges.

After Herbert retired from the Army, the urge to write about his experiences prompted him to produce a book titled *Soldier*. New York Times reporter James Wooten collaborated. The book recounted Herbert's experiences in the military, including his attempt to report war crimes and his subsequent treatment by the Army. In the wake of the My Lai trials, media attention quickly focused on Herbert, who continued to press his accusations against the Army while publicizing his book on radio and television programs. Among his numerous appearances was one on the "The Dick Cavett Show," whose viewing audience generally was considered to be highly intelligent.

During the Army investigation of Herbert's charges, Barry Lando, then a writer for CBS, interviewed Herbert. He was impressed by Herbert's story and believed in his sincerity. Indeed, CBS broadcast a portion of the interview on its Weekend News program. Moreover, after the Army had cleared Barnes and Franklin of Herbert's charges, Lando continued to interview Herbert and, in his new position as a producer for "60 Minutes," suggested to CBS correspondent Mike Wallace that "60 Minutes" offer a favorable presentation on Herbert and his charges. Wallace, who was skepti-

cal about some of Herbert's claims, told Lando he was reluctant to present Herbert's story. Instead, he suggested that Lando seek additional information.

Lando's subsequent investigation entailed interviews with more than 120 people and the examination of thousands of documents. For the most part, the Army cooperated with Lando's inquiries, but it refused to release its files on the investigations of Barnes and Franklin that had been prompted by Herbert's charges. Lando's further investigation, however, and his frequent conferences with Wallace, eventually convinced Lando that the Army had not relieved Herbert of command in Vietnam because of his purported attempt to report war crimes.

Based on Lando's disbelief in Herbert's story, Wallace agreed to broadcast a segment on "60 Minutes" casting doubt on the validity of Herbert's charges. The program was aired on February 4, 1973. Following the format of the "60 Minutes" presentation, "The Selling of Col. Herbert" was one of three segments broadcast that evening. In his introduction, Mike Wallace reviewed Herbert's charges as they had become known to the public through the media and Herbert's book *Soldier*. He then stated: " '60 Minutes' set out to investigate the validity of Herbert's allegations.... Here is our report." The program included film clips of Herbert's appearance on the "Dick Cavett Show," as well as portions of filmed interviews conducted by Wallace or Lando. In the course of the presentation, both Barnes and Franklin denied ever having received reports from Herbert about war crimes and atrocities. Moreover, individuals cited by Herbert in his book as supporting his story denied the accuracy of Herbert's charges. Some went even further, stating that Herbert himself could be capable of certain acts of brutality. Wallace concluded the program with this comment: "The Army could indeed help to resolve the controversy. They could open their files to a public airing. They could make themselves available for questioning about the whole Her-

bert business. But they won't.... Perhaps the best way to stop all speculation is to do what you heard Anthony Herbert and General Barnes suggest a moment ago: make the Army investigations public."

After the "60 Minutes" program was televised, Lando wrote about his investigation into Herbert's charges. He sold the article to the *Atlantic Monthly*. The editors added a preface, or "streamer," which summarized Lando's involvement with the Herbert case leading to the "60 Minutes" broadcast. In addition, the editors collaborated with Lando in creating a conclusion that was critical not only of Herbert, but also of the press for accepting Herbert's charges against the Army at face value. The last two lines read: "The press, which long had been negligent about dealing with the question of American war crimes, found in Herbert a heroic figure, a martyr through whom to dramatize the issue. But we bought ourselves a martyr with feet of clay." Illustrating the article were design graphics of five silhouettes of a soldier, appearing as targets on a firing range. As the article progressed, the silhouettes became increasingly riddled with bullet holes. The article was published in the May, 1973 issue of *Atlantic Monthly* under the title, "The Herbert Affair."

On January 25, 1974, Herbert filed an action for defamation against CBS, Lando, Wallace and the *Atlantic Monthly*. The defendants cooperated in the discovery proceedings for over one year, but finally objected to answering questions concerning the "editorial processes" involved in producing the broadcast and the article. Specifically, Herbert had sought information regarding Lando's state of mind while he was researching Herbert's claims, conversations that took place between Lando and Wallace, and reasons behind Lando's decisions ultimately to include or exclude certain materials.

Judge Haight ruled Herbert had a right to discovery in these areas. 73 F.R.D. 387 (S.D.N.Y.1977). This Court reversed on the ground that editorial processes were protected by the First Amendment. 568

F.2d 974 (2d Cir.1977). The Supreme Court reversed, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), and discovery continued. In late September, 1982, when discovery was complete, all defendants moved for summary judgment. In his memorandum filed in opposition to summary judgment, Herbert specified eleven statements appearing either in the broadcast or the article which he claimed were made with "actual malice" as defined in *New York Times v. Sullivan, supra.* On October 10, 1984, Judge Haight granted summary judgment for *Atlantic Monthly* and partial summary judgment for the remaining defendants with respect to nine of the eleven specific statements, finding there was no evidence that these statements were made with actual malice; he also denied summary judgment with respect to two other statements. 596 F.Supp. 1178. Entry of judgment dismissing the suit against *Atlantic Monthly* was ordered pursuant to Fed.R.Civ.P. 54(b).

Herbert moved for reargument, citing four additional statements he claimed were actionable, and protesting Judge Haight's refusal to consider the "overall import" of the publications as a basis for the defamation action. The district court denied the motion. 603 F.Supp. 983. On March 25, 1985, the remaining defendants—CBS, Lando, and Wallace—moved for dismissal of the two statements the court had deemed actionable. They claimed these statements could not possibly harm Herbert's reputation beyond the damage already done by the "nonactionable" statements. The district court denied this motion, and certified for appeal pursuant to 28 U.S.C. § 1292(b) the ruling granting partial summary judgment to defendants CBS, Lando and Wallace as to nine statements and denying summary judgment to these defendants as to the two remaining statements, the ruling denying plaintiff reargument, and the ruling denying defendants' renewed effort to dismiss the two remaining statements. We granted leave to appeal the issues raised below by orders dated June 6 and June 26, 1985.

## II. DISCUSSION

### A. *The Nine Nonactionable Statements*

■ We begin our discussion by reviewing the nine specific statements that Judge Haight found lacked any evidence of actual malice. (Appendix) [1] Following a painstaking analysis of the eleven statements specified by Herbert in his memorandum opposing summary judgment, Judge Haight held that in nine of the statements, Herbert had failed to produce sufficient evidence for a jury to find with convincing clarity that the statements were published with actual malice.

■ At the outset, we note that the "convincing clarity" standard for granting or denying summary judgment in defamation actions continues to be the law of this Circuit. *Yiamouyiannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir.1980) ("a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury *could find* actual malice with convincing clarity'," *quoting Nader v. deToledano*, 408 A.2d 31, 50 (D.C.App.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)) (emphasis in original).[2] Since discovery in this case is complete, we see no reason to depart from the standard set forth in *New York Times v. Sullivan, supra*, 376 U.S. at 285–86, 84 S.Ct. at 728–29 (jury verdict of liability reversed because "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands"), simply because the determination of no malice is made on a motion for summary judgment rather than after a trial.[3]

■ Having determined Judge Haight applied the proper standard in granting summary judgment in a defamation action, we need only review for error his holding that the nine statements were not false or, in any event, not made with actual malice. Statement (a) was Barnes's response to Lando's query whether Herbert had formally ever reported war crimes to him. Barnes stated, "He himself never did to me. Absolutely not." This portion of the interview was broadcast on "60 Minutes." Statement (b), also on the CBS broadcast, was a response by Franklin to Wallace's questions, in which Franklin stated, "I had many conversations with Colonel Herbert, we discussed many things but never war crimes." With respect to these statements, Judge Haight correctly noted the evidence produced by Herbert in an attempt to demonstrate Lando should have known the statements were false was not available to Lando at the time of the broadcast. It is

---

**1.** Herbert has conceded that he is a "limited purpose public figure" within the meaning of *New York Times v. Sullivan, supra,* and therefore he is required to show the defendants exercised "actual malice" in publishing the allegedly defamatory material. 596 F.Supp. at 1168. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Lerman v. Flynt Distributing Co., Inc.,* 745 F.2d 123, 136 (2d Cir.1984).

We do not consider here the four additional statements raised by Herbert for the first time in his motion for reargument. They were untimely pursuant to the district court's Civil Rule 3j (permitting the moving party to submit only those issues it believes the court overlooked).

**2.** We acknowledge the District of Columbia Circuit reached a different conclusion concerning the proper standard for summary judgment in defamation actions in *Liberty Lobby v. Anderson,* 746 F.2d 1563 (D.C.Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 691 (1985). Judge Scalia wrote that a judge in denying a libel defendant's motion for summary judgment must conclude that a reasonable jury could, on the basis of facts taken in the light most favorable to the public figure, find actual malice, but not that a reasonable jury could find actual malice with convincing clarity. 746 F.2d 1570–72. Judge Scalia believed the "convincing clarity" requirement was incompatible with the preliminary nature of summary judgment. *Id.* at 1571. *See also Hutchinson v. Proxmire,* 443 U.S. 111 & n. 9, 99 S.Ct. 2675 & n. 9, 61 L.Ed.2d 411 (1979) ("proof of 'actual malice' ... does not readily lend itself to summary disposition"). The Supreme Court has granted certiorari and heard argument in *Liberty Lobby.*

**3.** The Supreme Court recently held that the presence of actual malice is a question of law requiring an independent review of the record by appellate courts. *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). *Bose,* however, involved an appeal of a finding of liability after the completion of a bench trial.

**306**

self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication. *See Washington Post v. Keogh*, 365 F.2d 965 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). Judge Haight therefore correctly granted summary judgment for the defendants on these statements.

■ Statement (c) asserts that of several men interviewed, "none were certain that [Herbert] actually reported" war crimes to Franklin and Barnes. Indeed, the interviews reveal that two men who served under Herbert did back Herbert's story, but later recanted; another was "certain" only that he had told Lando he *believed* Herbert had reported war crimes to Franklin. Accordingly Judge Haight properly found that statement (c) was literally accurate.

■ Statements (d) and (e) concern Franklin's whereabouts on February 14, 1969, the day on which Herbert claims he reported the massacre of Cu Loi civilians to Franklin in Vietnam. Wallace stated in the broadcast that Franklin was on leave in Hawaii with his wife, and that the couple was registered at a hotel in Hawaii from February 7 to late in the afternoon on February 14. As additional evidence that Franklin was in Hawaii on the 14th, Wallace stated that Franklin wrote a check to the hotel "for the exact amount of the final bill, down to the last penny." Herbert claims these statements reflect factual inaccuracies—for example, the checkout bill at the hotel was actually for $25 more than the amount of Colonel Franklin's check, and there is some evidence that either Colonel or Mrs. Franklin may have left Hawaii on the 13th or early on the 14th—and that at the time of the broadcast Lando was aware of this conflicting evidence.

In affirming Judge Haight's determination that these statements were not made with actual malice, we must emphasize our duty is to determine not whether the statements are true or false, but whether the publisher was aware that they were false or recklessly disregarded their truth or fal-

sity. *New York Times v. Sullivan, supra.* It is equally important to note that recklessness, which Herbert alleges existed here, is not measured by whether a reasonable publisher would have published, but whether the publisher in fact "entertained serious doubts" as to the truth of his publication." *See St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In light of the indeterminate evidence, we have little difficulty agreeing with the district court that Wallace's statements lacked the requisite actual malice.

■ Statement (g) was made when Wallace confronted Herbert with the fact that Herbert had "no documents to show, not a piece of paper to show that you ever reported a war crime to anybody prior to the time that the My Lai trials were going on at Fort McPherson, Georgia." Judge Haight found that Herbert had admitted in an unaired portion of the interview that he had no such documents. In light of his own admission, Herbert stands on weak ground when he argues the defendants published the statement with actual malice.

■ Herbert also claims the defendants acted with actual malice by publishing statement (h), an account by Robert Stemme, a special agent in Vietnam, that Herbert had declined to intervene in the interrogation and beating of a Viet Cong nurse. Herbert claims Stemme's account of the story differs from that of another agent, Fred Brown, whom Lando also interviewed. Although minor details of the two versions do vary, the major facts in both accounts—that Herbert was present during the beating and did not attempt to stop it—are denied only by Herbert himself. Accordingly, the evidence is insufficient to show the defendants harbored any malice in publishing these facts.

■ Statement (j) appeared in the *Atlantic Monthly* article, and asserted: "It was only after Herbert had been transferred to Fort McPherson, Georgia, where the My Lai trials were in full swing, that there is any solid indication he was thinking

about reporting war crimes." Judge Haight ruled that "solid indication" was an expression of opinion, not fact, in that it represented Lando's evaluation of the evidence. We do not believe, however, a reasonable jury could find actual malice in light of the considerable evidentiary support for Lando's statement. It is, therefore, unnecessary for us to decide whether the assessment of evidence as "solid" is one of fact or opinion. Indeed, we could imagine circumstances in which an assertion that "no solid indication" exists might be so deliberately misleading as to be actionable. Because we are not faced with such a situation here, however, we affirm the district court's holding that this statement was not actionable.

■ Finally, Herbert challenges statement (k) in the magazine article, in which Lando wrote that New York Times reporter Wooten had come to believe in "most of [Herbert's] claims." Wooten himself, however, admitted in deposition that he "would not argue" with the passage and did not find it inaccurate. In light of this testimony, it would be testing the limits of imagination to suggest that a reasonable jury could find with convincing clarity that Lando wrote these words deliberately intending to misrepresent Wooten's state of mind about Herbert.

### B. "Overall Impact"

■ Herbert also appeals Judge Haight's refusal to consider the "overall impact" of the "60 Minutes" broadcast and the *Atlantic Monthly* article as a separate actionable basis for a defamation suit. Instead, Judge Haight held that in response to a summary judgment motion, a defamation plaintiff is obliged to specifically identify those statements which he claims were made with actual malice. 596 F.Supp. at 1197. Herbert claims the overall impact of the publications was defamatory and made with actual malice, and he urges Judge Haight should have taken into consideration the defamatory nature of the publications as a whole rather than only specific statements. We disagree. For the following reasons we hold the "overall impact" of the "60 Minutes" broadcast and the magazine article does not in itself constitute a cause of action.

For purposes of this analysis we distinguish between an overall defamatory *impact*, such as Herbert alleges exists here, and a particular defamatory *implication*, which in certain circumstances might be actionable. In the latter instance, a combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff. *See, e.g., Church of Scientology of California v. Flynn,* 744 F.2d 694 (9th Cir.1984); *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980).[4]

This case presents a different situation. Here, the defamatory "impact" of the publication is the same as the defamatory implication conveyed by each of the individual statements. That implication, as we shall later see, is that Herbert lied about reporting war crimes to his superiors in Vietnam and therefore must have been relieved of command for other reasons. Examining each of the specific statements Herbert claims was made with actual malice, however, we do not find a distinction between the defamatory meaning a viewer would derive from the particular statements, and the supposedly larger defamatory "impact"

---

4. If, for example, a newspaper account of a rash of neighborhood thefts also reported that a public figure had recently moved into the neighborhood, purchased tools commonly used in burglaries, and had been seen near a number of homes where burglaries had occurred, a reader would be led to believe that the individual described had committed the crimes. Such a deductive inference might well be actionable if there is proof the article was published with actual malice. *See* Keeton, *Defamation and Freedom of the Press,* 54 Tex.L.Rev. 1221, 1250–51 (1976); Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege,* 34 Rutgers L.Rev. 81, 100 (1981). While each individual statement alone might be literally accurate, in the aggregate they give rise to a false and defamatory inference.

**308**

Herbert insists is conveyed by the publication as a whole.[5]

The CBS broadcast of Colonel Franklin's denial of Herbert's charges, for example, corresponds exactly with the program's overall suggestion that Herbert lied about reporting war crimes. Moreover, Lando's article stated that there was no "solid indication" that Herbert began thinking about reporting war crimes until the My Lai trials had begun. This statement strongly suggests Herbert was capitalizing on the nation's concern about war crimes to excuse his relief from command. Finally, CBS related Stemme's account of Herbert's presence during the beating of a Viet Cong nurse, leading the viewer to conclude Herbert himself had condoned acts of brutality. Herbert has properly identified the specific statements that were allegedly made with actual malice. To permit Herbert to rest a cause of action in this case on the publication's "overall impact" would be a meaningless gesture, since the defamatory implications of the specific statements and the overall impact of the publications are identical.

*C. Dismissal of Atlantic Monthly*

Judge Haight granted summary judgment for *Atlantic Monthly* and dismissed the complaint against the magazine. We find his reasons for dismissal compelling. Our independent review of the evidence for actual malice, as required by the Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), reveals to us no indication the *Atlantic Monthly* exercised actual malice in publishing Lando's article.

■ The gravamen of Herbert's claim is that the magazine, by failing to further investigate the charges made by Lando against Herbert, exercised actual malice by publishing an article it knew contained false statements, or recklessly disregarded the possible falsity of the publication. We reiterate, however, that a finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing. *St. Amant v. Thompson, supra,* 390 U.S. at 731, 88 S.Ct. at 1325. Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are *"obvious* reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* (emphasis added).

■ In light of this heavy burden of proof, the purported evidence of actual malice cited by Herbert is unconvincing. Herbert claims, for example, that the editors were aware that Lando had once expressed hostility to Herbert [6] and knowledge of this confrontation should have raised "serious doubts" in their minds about the accuracy of Lando's article. In fact, however, the editors, alerted to the existence of the hostile encounter between Herbert and Lando, encouraged Lando to include a description and explanation of the incident in his article, which Lando did. These actions are indications of responsible editorial behavior, not actual malice. *See Food-Science Corp. v. McGraw-Hill,* 592 F.Supp. 362 (D.Vt.1984). Moreover, Lando's animosity towards Herbert, while putting the *Atlantic* on notice, does not in itself establish the article was false or that the editors should have known any part of it was false. *Hotchner v. Castillo-Puche,* 551 F.2d 910 (2d Cir.1977), *cert. denied,* 434

---

**5.** Herbert contends the CBS broadcast and the magazine article presented several defamatory allegations as a whole, including: (1) Herbert lied about reporting war crimes to his military superiors; (2) the publicity surrounding the My Lai massacre prompted Herbert to invent his story, suggesting that Herbert would use his country's concern over war crimes as a means of explaining his relief from command; (3) Herbert condoned and participated in brutal, violent and sadistic acts against the Vietnamese population and prisoners, and (4) Herbert lied about his experiences in his book *Soldier.*

**6.** After Wallace conducted a filmed interview of Herbert at CBS studios in New York, an argument ensued between Herbert and Lando during which Lando is alleged to have shouted, "I'll get you" and "I'll destroy you."

U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).[7]

 Herbert also cites as evidence of actual malice the magazine's post-publication receipt of several documents refuting Lando's version of Herbert's experiences. These documents include a nine-page "bill of discrepancies" submitted to the *Atlantic* by Herbert's literary agent, in a form unsuitable for publication; a poorly written article by a Tennessee reporter supporting Herbert's story; and two letters to the editor written by acquaintances of Herbert. The author of one letter claimed that Lando had hung up the phone when he tried to support Herbert's account of events in the Middle East. The other letter was critical of the way the Army treated Herbert when it administered a lie detector test to him. From this evidence, Herbert contends, a jury could infer reckless disregard by *Atlantic Monthly* at the pre-publication stage.

We must reject Herbert's argument. As we indicated earlier, inaccuracies brought to the attention of the publisher after publication are not relevant to the publisher's state of mind before publication. *Rosenbloom v. Metromedia*, 403 U.S. 29, 55, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971); *Gertz v. Robert Welch, Inc.*, 471 F.2d 801, 804 (7th Cir.1972), *rev'd on other grounds*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *McManus v. Doubleday*, 513 F.Supp. 1383, 1390 (S.D.N.Y.1981). Moreover, behavior such as the refusal to publish dissenting points of view is not alone sufficient to support an allegation of actual malice before publication. Properly read, *New York Times v. Sullivan* does not support the theory that a mere inference of actual malice, derived from post-publication behavior, could defeat a motion for summary judgment.[8]

## III. CROSS-APPEAL

 We now approach the most difficult question presented to us on this appeal: Should Judge Haight have granted summary judgment in favor of the defendants on the two statements he found merited a trial? One appeared in the *Atlantic Monthly* article, and the other was heard on the "60 Minutes" telecast. On cross-appeal, the appellees argue that the district court erroneously denied their motion for summary judgment on these two statements. We agree that the remaining statements are not actionable, and therefore remand to the district court with instructions to enter an order granting summary judgment to the defendants and dismissing the complaint.

The statement appearing in the *Atlantic Monthly* struck at Herbert's credibility with respect to a statement he had made to Lando:

Herbert had also claimed that one of the brigade's top enlisted men, Sergeant Major John Bittorie, had been listening in an outer office when Herbert reported to Colonel Franklin an incident of water torture. When the Army CID questioned him, Bittorie denied Herbert's claim. Herbert told me the reason was that although Bittorie himself was retired, he still had two sons in the service and had to worry about their careers. But when I flew to Columbus, Georgia, to interview Bittorie, he again denied having overheard any such report.

7. Particularly relevant to the state of mind of the *Atlantic* editors in publishing the article was their knowledge that CBS had already determined the substance of Lando's report fit for publication. Moreover, *Atlantic Monthly* had considerable reason to trust Lando's reliability as a reporter, having previously published an article written by Lando, and having learned upon inquiry of his former employer, *Time* magazine, that he had a respected reputation.

8. Although it is not essential to our holding, we note the *Atlantic Monthly* did publish two letters in its July, 1973 issue that were generally critical of Lando's article.

We do not agree with Herbert that the article's graphics and the prefatory "streamer" are sufficient manifestations of the magazine's endorsement of the article to render the *Atlantic* independently liable for the article's content. Rather, we view the streamer and graphics as little more than the minimal packaging required to make the piece readable and attractive.

What about his sons who are in the Army? I asked. *He had no sons.*

596 F.Supp. at 1212.

Herbert submitted an affidavit, executed by Bittorie, attesting to the fact that he had informed Lando he was the father of both a son and a daughter, and that when Bittorie had spoken with Herbert the son was indeed serving in the Army. Based on this evidence, Judge Haight ruled a jury could find that Lando published his statement with knowing falsity, and therefore held this statement to be actionable.

The second statement was made by Mike Wallace in the "60 Minutes" broadcast:

We have spoken with many men who saw Herbert after his relief in Vietnam ... to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges.

596 F.Supp. at 1217. As Judge Haight recognized, it is clear from the context of the broadcast that Wallace was focusing on whether Herbert had made his claim while still in Vietnam.

Herbert contended in the district court that three individuals had told Lando the precise opposite—that Herbert had in fact told them he was relieved because he had tried to report war crimes. Judge Haight correctly refused to consider the affidavits of two of these individuals, because Herbert spoke with them about his relief from command only after he returned from Vietnam. Judge Haight then found, however, that one individual—a helicopter pilot named Kahila—claimed that in Vietnam Herbert had told him that Herbert was relieved because "of Army politicking resulting from his reporting the Cu Loi killings...." Viewing this affidavit as creating an issue of credibility inappropriate for resolution on summary judgment, Judge Haight ruled the statement was actionable.

In urging this Court to reverse the district court holding related to the two remaining statements, appellees rely on the incremental harm branch of the libel-proof doctrine.[9] This novel theory was first applied by Judge Weinfeld in *Simmons Ford, Inc. v. Consumers Union*, 516 F.Supp. 742 (S.D.N.Y.1981). *See generally* Note, *The Libel-Proof Plaintiff Doctrine*, 98 Harv.L. Rev. 1909 (1985). In *Simmons Ford*, defendant's magazine, a periodical for consumers, published a critical evaluation of plaintiff's new electric car and rated it "Not Acceptable." The accompanying article enumerated a great many reasons for the low rating, including poor acceleration, low top speed, poor braking, poor handling, poor ride, poor comfort and generally negative performance. The only portion of the article challenged by plaintiff was a paragraph asserting that the car did not meet federal safety regulations. The regulations referred to in the article set forth applicable standards for cars equipped with passive restraints such as airbags. In fact, however, the electric car was equipped with seatbelts, which were regulated by a separate set of standards. The article, therefore, implied the car did not meet federal safety standards that in reality were inapplicable to the car. Judge Weinfeld ruled there was ample basis in fact to justify defendant's conclusion that the car was "not acceptable," and further adverse comment about the car could not give rise to

---

**9.** The libel-proof doctrine was first introduced in this Circuit in *Cardillo v. Doubleday & Co.*, 518 F.2d 638 (2d Cir.1975). Robert Cardillo was a convicted figure in organized crime who sued Doubleday for publishing a book in which Cardillo was mentioned as having participated in various criminal enterprises. The district court granted summary judgment for the defendants and dismissed the action, holding that Cardillo had not shown the existence of actual malice under the *New York Times v. Sullivan* standard. On appeal, Cardillo argued that the Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, handed down after the district court's decision, permitted the actual malice standard to be disregarded by state libel law in cases involving neither public figures nor public officials. This court found it unnecessary to address the question of New York state law because it determined Cardillo to be "libel-proof"—that is, "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages as to warrant dismissal of the case, involving as it does First Amendment considerations." 518 F.2d at 639.

more than nominal damages. Accordingly, he granted summary judgment for the magazine.

This branch of the "libel-proof" doctrine thus measures the incremental harm inflicted by the challenged statements beyond the harm imposed by the rest of the publication. If that harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable. *Simmons Ford, Inc. v. Consumers Union, supra; see Bose Corp. v. Consumers Union of United States,* 529 F.Supp. 357, 362 (D.Mass.1981), *rev'd on other grounds,* 692 F.2d 189 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Sharon v. Time, Inc.,* 575 F.Supp 1162 (S.D.N.Y.1983). Judge Haight, however, declined to apply the "libel-proof" doctrine in this case because Herbert, unlike the plaintiff in *Simmons Ford,* challenged not just one, but many statements he believed were false and defamatory in the publication. Because he believed that a plaintiff who could not produce evidence of actual malice as to certain statements was not necessarily conceding the truth of those statements, Judge Haight deemed it inequitable to preclude Herbert from producing evidence of actual malice on the remaining statements before the trier of fact.

We believe, however, a reasoned and different ground exists in this case for granting summary judgment on the remaining two statements.[10] To begin our analysis, we return to the nine statements dismissed by Judge Haight as nonactionable because their publication bore no evidence of actual malice. On the basis of these very statements, we believe the appellees had ample grounds to support their conclusion that Herbert had not reported war crimes to his superiors in Vietnam, and therefore must have been relieved of command for other reasons. Reviewing the evidence presented in affidavits and depositions, we are led to conclude that CBS, Lando and Wallace knew that both Barnes and Franklin denied having received reports of war crimes from Herbert; that no one could verify from personal knowledge Herbert's insistence that he reported war crimes to Barnes and Franklin; and that the first substantiated accusations against his superiors were made by Herbert seventeen months after his relief from command, and after Herbert had returned to the United States. In light of this evidence, the appellees could not be said to have had actual malice in publishing their view that (1) Herbert lied about reporting war crimes to his superiors in Vietnam, and (2) Herbert's relief from command must therefore have been for other reasons.

Having decided the appellees did not publish these views with actual malice, we confront the question whether Herbert should be allowed to base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views. The first statement, which appeared in the magazine article, was defamatory only in that the incorrect assertion that "Bittorie had no sons" implied that Bittorie was more credible than Herbert had suggested. Accordingly, this implication strengthened Lando's portrayal of Herbert as a man who lied about reporting war crimes to his superiors.[11] We have already agreed, however, that given the amount of other evidence supporting this view, the appellees did not publish this conclusion with actual malice. Because we consider Herbert's truthfulness in assessing Bittorie's credibility to be merely a subsidiary matter to the primary, non-

---

10. Some may view our holding today as a variation of the "libel-proof" doctrine, but we need not so characterize it.

11. The chain of reasoning is somewhat elaborate. The statement that Bittorie had no sons implied that Bittorie lacked the motive (protection of his sons' army careers) ascribed to him by Herbert as Bittorie's reason for not corroborating Herbert's account of reporting war crimes to Franklin. The fact that Bittorie had a son was some evidence that Bittorie did have a motive to lie when he denied overhearing Herbert report war crimes to Franklin. If Bittorie had a motive to lie, this was some evidence that Bittorie was lying. If Bittorie was lying, this was some evidence that Herbert had reported war crimes to Franklin.

actionable issue—whether Herbert lied about reporting war crimes—we hold this statement as well to be nonactionable.

The second statement, delivered by Mike Wallace on "60 Minutes," contained the assertion that "to a man," those who spoke with Wallace and his staff said that Herbert never told them in Vietnam that he had been relieved for reporting war crimes. Admittedly, this statement undermines Herbert's credibility with respect to his assertion that he reported war crimes. We have already held, however, that the appellees did not have actual malice in publishing their view that Herbert was relieved for reasons other than his allegations of war crimes. The only potentially defamatory inference that could be drawn from Wallace's statement is that Herbert was relieved from command for reasons other than reporting war crimes. But we have already held this not to be actionable.

We do not mean to imply by our holding that appellees could have published with impunity a vast collection of false statements so extensive as to portray Herbert as a liar in every respect. Such a portrayal may well be actionable. Rather, we hold that if the appellees' published view that Herbert lied about reporting war crimes was not actionable, other statements—even those that might be found to have been published with actual malice—should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery. We do not intend by our holding to permit defamation defendants to freely embellish their stories with falsehoods while remaining free from liability. In this case, however, the abundance of other evidence supporting the appellees' skepticism of Her-

bert's story was sufficient to justify the district court's finding of no malice. Our holding is thus limited to those cases in which statements allegedly made with knowing falsity or reckless disregard give rise to defamatory inferences that are only supportive of inferences that are not actionable.[12] For Herbert to base his defamation action on subsidiary statements whose ultimate defamatory implications are themselves not actionable, we believe, ·would be a classic case of the tail wagging the dog.

Our decision today calls for the granting of summary judgment on the remaining two statements simply because their defamatory implications are not actionable. We therefore need not decide whether a court can grant summary judgment on separate, unrelated statements, which may have been made with actual malice, pursuant to the incremental harm branch of the libel-proof doctrine.

We do not believe that Herbert has presented a claim suitable for disposition at trial, and therefore the district court should have granted summary judgment for all defendants. Thus this protracted litigation, which has been filled with anger, charges and countercharges in an area of the law where emotions frequently obfuscate the facts and law, has finally come to a close in this Court.

## IV. CONCLUSION

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded with instructions that summary judgment be entered for defendants and the complaint be dismissed.

---

**12.** Judge Haight reckoned with the view we have expressed, but concluded, with reference to the "Bittorie's sons" statement, that the statement was actionable because it had two implications: "a particular one (Herbert did not report water torture to Franklin), and a general one (Herbert tells lies)." 596 F.Supp. at 1213. Judge Haight concluded that the latter implication rendered the statement actionable. The reason we disagree is that the statement does

not imply that Herbert, in general, is a liar. It implies, at most, that he told a lie in his effort to counter the claim that he had not reported war crimes. We would have a very different case if a statement, otherwise actionable, implied that Herbert was generally a liar or even that he had lied on some significant matter unrelated to the truth of statements determined not to be actionable.

APPENDIX

In his papers opposing defendants' motion for summary judgment, Herbert specified the following eleven statements as having been made with actual malice:

(a) On the program, in answer to Lando's question to Barnes whether "Herbert ever formally or informally reported any war crimes or atrocities" to him, Barnes stated, "He himself never did to me. Absolutely not." Lando knew, however, that Herbert had reported POW mistreatment at the An Khe compound to Barnes through his XO, Bethea, who immediately conveyed the information to Barnes.

(b) On the program and in the article, in answer to Wallace's questions, Franklin stated that Herbert "never" reported war crimes or atrocities of any nature to him "In no way, either orally or in writing. I had many conversations with Colonel Herbert, we discussed many things but never war crimes." Lando knew, however, that Herbert had discussed the An Khe mistreatment with Franklin and that Franklin conceded Herbert "possibly" discussed with him mistreatment of the Vietnamese by American advisors and ARVN forces.

(c) Wallace stated, "Several men serving under Herbert said they had heard Herbert say, while in Vietnam, that he had reported the February 14 killings, but none were certain that he had actually reported them." In fact, both Lando and Wallace knew that (1) not several, but many men while in Vietnam heard Herbert say he had reported the Cu Loi killings; (2) many men heard, in addition, Herbert's warnings that war crimes and atrocities, like Cu Loi, were absolutely prohibited; (3) several men had not only heard Herbert say he had reported the February 14 murders but several men *themselves* heard or saw Herbert reporting the killings. (emphasis in original).

(d) Wallace stated that Franklin's check for his Hawaii hotel room was "for the exact amount of the hotel bill" (Pr.Tr. 6), while the article stated that the check was made out "for the exact

amount of the final bill, down to the last penny" (Art. p. 77). Both Lando and Wallace knew that Franklin's check was not for the "exact amount," but $25 less than the hotel's final bill.

(e) On the program, Wallace stated: "Checking with the Ilikai Hotel in Hawaii, we found that Colonel and Mrs. Franklin had indeed been registered there from February 7 to late in the afternoon of February 14 (Pr.Tr 6) CBS knew that the Ilikai records revealed that either Col. or Mr. Franklin left on February 13 or "early the 14th," but not which, and Lando considered it a "toss-up" as to which was the case.

(f) Lando wrote Bittorie "had no sons" (Art. p. 78). In fact, as Lando was told by Bittorie, he had a son.

(g) Wallace stated, "you have no documents to show, not a piece of paper to show that you ever reported a war crime to anybody prior to the time that the My Lai trials were going on at Fort McPherson, Georgia" (Pr.Tr. 7), while defendants knew that Herbert's report of the An Khe mistreatment, the Arnold Report, and Boyer's statement of September 10, 1969, were all "pieces of paper" which showed Herbert reported a war crime to somebody prior to the My Lai trials.

(h) Wallace stated that Stemme described Herbert as present "as a Viet Cong nurse was being interrogated by ARVN troops, being beaten by them to get her to talk" (Pr.Tr. 12). In fact, Lando knew that was not what Stemme had told him.

(i) Wallace stated: "We have spoken with many men who saw Herbert after his relief in Vietnam ... to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges" (Pr.Tr. 9). Lando had been told, in words or substance, the exact opposite by at least three men whom he spoke to whom [sic] had seen Herbert after his relief.

(j) The article stated: "It was only after Herbert had been transferred to Fort

**314**

McPherson, Georgia, where the My Lai trials were in full swing, that there is any solid indication he was thinking about reporting war crimes" (Art. p. 79). Lando knew from numerous people he spoke to that Herbert talked in Vietnam about the war crimes and having reported them and that he had been seen or heard talking about the Cu Loi murders on the radio and at Brigade Headquarters.

(k) Lando wrote that Wooten has come to believe in "most of [Herbert's] claims" (Art. p. 74) when Wooten never limited his belief in Herbert.